The FUND FOR ANIMALS, INC., Plaintiff,

v.

Manual LUJAN, Jr., in his official capacity as Secretary of the United States Department of the Interior; Clayton Yeutter, in his official capacity as Secretary of the United States Department of Agriculture; and K.L. Cool, in his official capacity as Director of the State of Montana Department of Fish, Wildlife and Parks, Les Graham, in his official capacity as Director of the State of Montana Department of Livestock; and the State of Montana, By and Through Marc Racicot, Attorney General, Defendants.

No. CV 90–142–M–CCL.

United States District Court, D. Montana, Missoula Division.

Jan. 15, 1991.

Supplemental Memorandum Jan. 27, 1991.

---

Noel K. Larrivee, Larrivee Law Office, Missoula, Mont., W. Craig James, Skinner, Fawcett & Mauk, Boise, Idaho, for plaintiff.

Robert J. Brooks, Asst. U.S. Atty., Butte, Mont., Will Hutchison and Norman C. Peterson, Dept. of Justice, R.J. Sewell, Jr., Lewis K. Smith, Smith Law Firm, P.C., Helena, Mont., for defendants.

## MEMORANDUM AND ORDER DENYING INJUNCTIVE RELIEF

LOVELL, District Judge.

The Fund for Animals (Fund) seeks to restrain Defendants from taking any further action which results in the shooting of bison outside the boundaries of Yellowstone National Park. Plaintiff also seeks to require Defendants to take such affirmative steps as may be necessary to prevent migration of bison out of Yellowstone National Park. Finally, the Fund seeks to preliminarily enjoin the Defendants from taking any action which results in reduction of the bison population pending completion of an environmental impact statement pursuant to 42 U.S.C. § 4321 et seq.

The court having heard the parties fully, and having considered the evidence and the law carefully, now *denies* Plaintiff's requested emergency injunctive relief. The hunting and shooting of bison may continue under the Interim Plan. This decision is based upon findings of fact and conclusions of law which, in the interest of a prompt ruling, are summarized and partially set

forth below. A detailed memorandum fully explaining the court's ruling will follow in due course.

FINDINGS OF FACT

The court finds the following facts:

1. The Yellowstone bison population is approximately 3,000 animals. This represents a surplus of 600 head over capacity. At the turn of the century there existed 20 to 50 buffalo within the boundaries of Yellowstone National Park. By 1954, the population of the northern herd alone had reached 1500 animals. Reductions inside the Park were conducted, and in 1967, the entire herd consisted of 397 animals. In 1966, the Park Service determined it would no longer actively manage the bison, allowing natural regulation to control the herd size instead. This is the anomaly of management through non-management. In 1988, the herd reached a peak of 2800 bison.

2. During the winter of 1988–1989, 569 bison were taken as a result of the damage control hunt authorized by the State of Montana to control the excess bison migrating into Montana. The herd has since replenished itself to at or above its prior population level. Thus, the 1988–1989 hunt had no negative biological effect upon the overall bison population.

3. None of the three herds in the Park is in danger of eradication due to the damage control hunt. Only 4 bison were killed last winter while 16 have been taken this winter. The Interim Bison Policy does not contemplate reducing the herd to a level which would threaten existence or genetic health of the Yellowstone bison.

4. The three bison herds in the Park are in no significant way biologically or genetically unique or distinct. On this critical issue, the court accepts the testimony of its expert, Dr. Cameron, and portions of the testimony of Dr. Meagher. Therefore, in considering the dangers in depopulating the bison herd we look to its total size, 3,000 head—not just the size of the northern herd.

5. The determination that a core herd of approximately 200 animals should be maintained in the Northern range is not unreasonable based on the ability of the bison to recover. The Northern herd has tripled in size in ten years (1975 to 1985). Moreover, past history of the Northern herd suggests it to be at its equilibrium when the population remains at or about 200.

6. Although it may be desirable to maintain the Northern herd at 200, continued existence of the herd is not necessary to the continued survival of the Yellowstone bison because the total population is genetically healthy.

7. Without interference from man, and with no management, the Northern herd would, in time, retake and occupy the entire Yellowstone Valley outside the Park.

8. Should Plaintiff prevail in this case, or should this court require the Park Service to confine the bison herd to the Park, the result would be elimination of about 1,000 bison. Termination of the Park's winter recreation program could also be required.

9. Control measures contemplated by the Interim Plan will have little, if any, effect on the gender ratios of the bison. In 1988–1989, a nearly equal number of cows and bulls were removed from the herd. In any event, bison do not require one-to-one sex ratios in order to reproduce.

10. Reduction of bison outside the Park will not significantly affect other wildlife, such as grizzlies, inside the Park. Although grizzly bear depend on carrion in the spring, use of carrion in the Northern range is lower due to the open range and lack of security cover. In addition, the northern elk population, which is currently at or about 14,000 animals, provides a substantial source of carrion for the grizzly and other scavengers. Finally, bison still die within the Park, particularly in the Pelican Valley where grizzly use of bison carrion is higher due to security cover.

11. Uncontrolled migration of potentially brucellosis-infected bison into Montana causes a real and present danger to the livestock industry of Montana as well as a significant health risk to humans. The court accepts the testimony of Drs. Cameron and Ferlicka on this important issue.

12. Brucellosis is a serious disease both in livestock and in humans. The disease causes sterility and fetal abortions in livestock and undulant fever in humans. Once contracted there is no cure for brucellosis or undulant fever because it is a facultative intracellular parasite. In other words, it hides inside host cells, where it can escape antibodies and antibiotics.

13. Prior to the 1940's, undulant fever was a significant health risk. Five percent of those who contracted it died. Since eradication, the incident rate of undulant fever has declined 99%.

14. The brucellosis organism can survive 10–57 days in tap water; 5–78 days in cloth or fabric; 100 days in untreated manure; 43 days in dry soil; and 66 days in damp soil. Moreover, the bacteria can indefinitely survive freezing. The disease is transmitted through raw milk, through fluids surrounding the animal fetus, and through the aborted fetus itself.

15. Montana has only recently (1985) achieved status as a brucellosis-free state, after 30 years of effort and expenditure of $30 million. Nationally, $1 billion has been spent on eradication of brucellosis.

16. Montana exports substantial numbers of beef cattle nationally and internationally. In 1989, 800,000 cattle were shipped out of state. Montana cattle producers depend upon the ability to freely ship livestock in interstate commerce.

17. The brucellosis-free status achieved by Montana directly affects the ability of cattle producers to ship livestock in interstate commerce and saves $1 to $2 million per year by allowing cattle to be shipped without testing.

18. Brucellosis can exist in two types of hosts, dead-end hosts and preferential hosts. Humans, as well as small animals such as rodents and birds, are dead-end hosts. Humans and small animals become ill but do not readily transmit the disease. Ungulates such as bison, cattle, and elk are preferential hosts of which the disease can take advantage and leave to infect other species.

19. Elk do not presently pose a significant risk of transmission of the disease due to their low rate of infection (1.4% in Yellowstone elk), and their different social behavior patterns.

20. Fifty-four percent of the Yellowstone bison tested in 1988 (465 animals) tested positive for brucellosis and are therefore infected. Tissue tests of Yellowstone bison have isolated or cultured the brucellosis bacteria. The court finds that about half the Yellowstone bison herd is infected with brucellosis.

21. Results from a study conducted at the Texas A & M School of Veterinary Medicine conclusively show that bison are susceptible to brucellosis, as are domestic livestock. The court finds that bison and livestock readily transmit the disease to each other.

22. Bison migrate out of Yellowstone Park onto private and public land used by cattle.

23. In addition to the significant risk of brucellosis, bison migrating into Montana pose a risk of damage to private property and a risk of conflict with humans. Yellowstone bison are wild animals which quickly respond to encroachment by humans. A greater potential for human/bison conflict near gateway communities to the Park arises as larger numbers of bison migrate from the Park.

24. Past and present non-lethal attempts at containing the bison within Yellowstone Park have met with inadequate and limited success.

25. The actions contemplated under the 1990 Interim Bison Management Policy are not materially different from those actions implemented beginning in 1985 following completion of an environmental assessment by the National Park Service and the Department of Fish, Wildlife, and Parks. The ultimate effect on the bison is the same; bison which migrate out of Yellowstone National Park and pose a threat to the health, welfare, and safety of Montana citizens will be removed. The two plans are, therefore, equivalent for purposes of this case.

26. Plaintiff advocates chemical sterilization of bison. Dr. Cameron and Dr. Ferlicka disputed the efficacy of this process. The court finds that it is not a viable or effective means of herd reduction or control.

27. The Park Service has adopted a "hands-off" policy in an attempt to manage the bison in a wild state without fencing, feeding, killing, sterilization, or other artificial intervention. Montana has tried to cooperate with the Park Service in an effort to protect the bison, yet also protect Montana interests.

28. Montana has an absolute right under its police powers, in protecting the health, safety, and welfare of its inhabitants, to remove by reasonable means, possibly infected trespassing federal bison which migrate into Montana.

29. So long as the Park Service pursues its present "hands-off" policy, Montana may continue to be forced to remove trespassing federal bison migrating into Montana. Montana has received undeserved bad press and criticism for reacting reasonably to a dangerous situation created by federal park policy.

30. It is not unlawful or legally wrong for Montana to license the hunting of bison. It is immaterial whether this is termed a sport hunt or a depredation hunt. Hunting is a time-honored avocation and a legitimate and recognized method of animal control. The court sees no reason to stop the use of hunters so long as this reduction tool is reasonably employed and supervised by Montana.

31. The Park Service can maintain its "hands-off" policy of bison non-management only so long as it has the cooperation of Montana. While the Montana Department of Livestock has sought federal administrative quarantine of the Yellowstone bison herd, the official policy of Montana remains one of cooperation with the Park Service in an effort to effectuate Yellowstone's policy. Should Montana change its position and demand that Yellowstone confine its bison, a different issue is presented. That could conceivably result in the court ordering confinement of the bison in the Park. Such confinement could result in a major herd reduction, change of character and domestication of the remainder, with far reaching consequences such as loss of our only wild free-ranging bison herd.

CONCLUSIONS OF LAW

 To prevail on its motion for preliminary injunction, Plaintiff must show (1) probable success on the merits, (2) possible irreparable injury, and (3) a public interest favoring plaintiff. *Caribbean Marine Services Co. v. Baldrige*, 844 F.2d 668 (9th Cir.1988). A plaintiff may meet its burden by demonstrating a combination of probable success on the merits and a possibility of irreparable harm. *Id.* at 674. In the alternative, where the balance of hardships tips decidedly toward the plaintiff, the court need not require a robust showing of likelihood of success on the merits and may grant relief if the plaintiff's moving papers raise "serious questions" on the merits. *Id.*

 Here, the court finds and concludes that the Fund has not satisfied any of the tests necessary to obtain relief. The balance of hardship does not tip decidedly toward the Plaintiff, and therefore Plaintiff must do more than raise questions by its motion.

Having failed to tip the scale in its favor, Plaintiff must demonstrate a likelihood of success on the merits, which it has not done. The alleged harm is not shown to be irreparable. The evidence is clear that the Yellowstone bison herd is at a level in excess of its historic population. Significant reductions of the herd in the past have not affected the ability of the bison to repopulate. Viewing opportunities would not be significantly affected as bison are found throughout the Park.

Finally, stopping the interim control actions would not be in the public interest given the serious threat of brucellosis, the large number of excess bison, and the lack of feasible alternatives to control bison migrating out of the Park. Also, the principles of *res judicata* and collateral estoppel apply. Accordingly,

IT IS HEREBY ORDERED that Plaintiff Fund for Animals' application for a temporary restraining order and preliminary injunction is DENIED.

IT IS FURTHER ORDERED that the clerk shall forthwith provide copies of the court's order to counsel.

## SUPPLEMENTAL MEMORANDUM

This memorandum supplements the court's January 15, 1991, "Memorandum and Order Denying Injunctive Relief."

*The Bison Dilemma.* The "hands-off" policy of the Park Service has permitted the Yellowstone Bison herd to increase dramatically. The herd now numbers 3000 head which is about 600 over capacity for the Park habitat. This policy has promoted the ideals of the Park—wild animals freely roaming in wild habitat. The Park policy, thus, has been immensely successful; however, without Montana's active participation in that policy, it is invalid. This is because any healthy animal herd which has reached the capacity of its habitat must be controlled and maintained in numbers within the habitat's capacity. Every livestock raiser knows this and applies this principle, usually by annual thinning of surplus animals.

The Park policy, though, coupled with the cooperation of Montana, becomes almost ingenious in its operation and effectiveness. The state, in effect, has carried out the Park's duty of periodically thinning and culling the herd. This has maintained a balance of animal numbers with habitat and produced maximum numbers of bison for enjoyment by the public. The thinning of the Park herd by Montana poses no threat to the bison herd and could continue indefinitely.

This method utilizes park habitat to the maximum by only thinning animals when over capacity is reached and the bison move into Montana and onto leased and fee ranch lands. It also naturally selects the animals for thinning from those with a genetic or other tendency to migrate, while preserving those bison who stay at home. The Park Service, thus, has no fences, no corrals, no loading or transporting equipment, no feeding facilities or feed, no herders or hazers, and in fact no readily available resources or expertise to immediately contain the bison within the Park.

Turning to the other side of the equation, the impact on Montana of these trespassing federal bison—infected with brucellosis—is most significant. The one fact present which cannot be overstated is the seriousness of the disease and the seriousness of the exposure of infected bison to Montana cattle. The health hazards—to human and animal—are substantial. It is in this light, then, that the court has concluded that Montana must be allowed to protect its inhabitants by removal of the bison.

It is immaterial that Montana has authorized private hunters to shoot bison under supervision of state wardens. Hunting is a useful tool in animal control but is not otherwise an issue here.

It is worth emphasizing that the plan attacked by this suit is an *interim* plan—a short term intermediate remedy while the comprehensive study is conducted. The court from the outset of this suit has considered conducting status and settlement conferences in this case in an effort to expedite final resolution of this complex problem. This remains a possibility, if the litigation continues. The court has determined that Plaintiff has failed to establish any of the requisites for emergency injunctive relief, including want of evidence of irreparable harm and probability of success on the merits. The court's reasoning follows.

*Fund Suit I.* In 1985, *The Fund for Animals v. Hodel,* civil action CV 85–250–BU was filed in this court. That suit sought declaratory and injunctive relief and in many ways mirrored the present action. These will be referred to respectively as "Fund suit I" and "Fund suit II." In Fund suit I, the plaintiff was identical with plaintiff in Fund suit II. Defendants in Fund suit I were the Secretary, the Park Service, and its supervisor. Plaintiff sought to stop the Park Service from taking any action which would allow migrating bison to be killed. The Fund also sought

an order requiring the Park Service to contain the bison in the park. Plaintiff contended that an EIS was mandatory. The court denied the request for restraining order, and on completion of discovery, the cause was submitted on the merits on cross motions for summary judgment. The court ruled in favor of Defendants holding that the preferred alternative in the EA did not constitute arbitrary and capricious action and that NEPA did not mandate an EIS. The court held that no major federal action was involved. Final judgment was entered and neither party appealed.

■ *Standing.* The court found that Plaintiff has standing to sue, although not for the psychological reasons asserted. A party has standing if it can show injury in fact arising from the action and injury arguably within the zone of interest to be protected by a violated statute. *Animal Lovers Volunteer Asso. (A.L.V.A.) v. Weinberger,* 765 F.2d 937 (9th Cir.1985). A general contention that its members will suffer psychological impact from a particular action because of its members' dedication to protecting animals is not enough to establish individual injury unless the psychological injury arises out of the direct sensory impact due to a change in the Fund's physical environment. *See Id.* at 938. (Group which sued to stop killing of goats by military did not have standing to sue based on psychological injury they would suffer.) At the hearing on plaintiff's motion, the Fund stressed the psychological impact its members would suffer knowing that bison could be shot if they migrated outside Park boundaries. Such testimony is not persuasive to establish standing. It is clear from the evidence that removal of bison which pose a threat to human health, safety, and welfare does not create a change in the physical environment. Despite reductions in the herd in previous years, the bison population in Yellowstone Park is larger today than it has been in the last ninety years.

■ Although none of the parties argued it, the court is more persuaded by the fact that the Fund litigated this issue in 1985 in Fund suit I. The Park Service failed to raise the issue of standing at that time. In addition, the Fund has a long involvement with this issue and apparently claims limited agreements from the Park Service to take certain steps to contain the bison.[1] While organizational standing is not merely a matter of age or fame, it is relevant if the group cannot point to activity which antedates the legal action. *A.L.V.A.* at 939. Moreover, where an organization had an interest in the issue because of an agreement between it and the United States and the issue litigated involves frustration of that claimed agreement, the organization has standing to sue. *See Animal Protection Institute v. Hodel,* 860 F.2d 920 (9th Cir.1988) (Animal protection group had a special interest in monitoring the wild horse program because of agreement between the group and the Secretary of Interior.)

■ *Res adjudicata.* Claim preclusion, which is synonymous with "res adjudicata" as that term is used in the narrow sense, bars the relitigation of a claim even if the particular theories of recovery or defenses raised in the second proceeding were not actually litigated in the first action. *Shaw v. California Dept. of Alcoholic Beverage Control,* 788 F.2d 600 (9th Cir.1986). The doctrine of claim preclusion "provides that a valid, final judgment, when rendered on the merits, is a bar to a subsequent action between the same parties or those in privity with them upon the same cause of action." *Hooker v. Klein,* 573 F.2d 1360, 1367 (9th Cir.1978) *cert. denied,* 439 U.S. 932, 99 S.Ct. 323, 58 L.Ed.2d 327 (1978) (citations omitted).

■ Here, the Fund seems to be precluded from relitigating its claim against the federal defendants because this court entered a final, valid judgment involving the parties, or those in privity with them and

---

**1.** Letter from Noel Larrivee to Robert Barbee, January 14, 1986, Deposition exhibit P1–2, *Fund v. Hodel,* CV 85–250–BU.

the Fund is seeking to again bring the same claim.

In Fund suit I, defendants were the Secretary of Interior, the Director of the National Park Service, and the Superintendent of Yellowstone National Park. Plaintiff claimed *inter alia* that the defendants had violated their affirmative duty to conduct an environmental impact statement under the National Environmental Policy Act, 42 U.S.C. § 4341, *et seq.*, before allowing bison to migrate into the State of Montana where they could be removed by Montana Fish, Wildlife and Park game wardens and/or hunters which had obtained a special permit. The Fund sought a temporary restraining order to prevent the Defendants from allowing bison to migrate out of Yellowstone Park and a preliminary and permanent injunction to stop the Defendants from allowing the killing of bison. (Plaintiff's complaint, Nov. 23, 1985, CV 85–250–BU). The court denied the Fund's request for a restraining order and for injunctive relief and allowed the parties to proceed with discovery. On cross motions for summary judgment, the court granted judgment in favor of the federal defendants on the NEPA claim. The court found that defendants had considered, under the EA prepared in 1982 and 1985, a number of different alternatives for handling bison which migrate out of the park. Based upon considerations of the current management policies, the nature of the bison themselves, and the effect of the different alternatives on all of the park's resources and environment, the Park Service chose to allow the migration to continue. *Fund v. Hodel*, CV 85–250–BU, slip op. at 6. The court held that the decision of the federal government not to restrict the free-ranging movement of the bison was not a major federal action nor was it arbitrary, capricious or unreasonable. Finally, the court held that even if it were, no EIS was required because allowing bison to migrate out of the Park did not constitute an irreversible or irretrievable commitment of resources. *Id.*

The Fund contends this action is different from the prior suit because the defendants are not the same (the Secretary of Agriculture and various Departments of the State of Montana have been added); the defendants are acting in concert now and were not in the prior suit; the Interim Policy provides for different acts by the Park Service in removing the bison; and the allegations in this suit involve failure by the defendants to prepare an environmental impact statement to evaluate the Interim Policy while the allegations in the prior suit involved failure to prepare an EIS to evaluate the Park Service decision not to contain the bison within the Park.

These are distinctions without a difference. Here, as in Fund suit I, the Fund seeks to stop the Park Service from participating in any activity which results in the destruction of bison migrating out of Yellowstone Park. Although the Fund alleges that the Interim Bison Policy under which defendants are acting violates 40 C.F.R. 1500, *et seq.*, all of the federal regulations cited involve the issue of whether the interim action constitutes a major federal action which may significantly affect the quality of the human environment. These claims are controlled, therefore, by the court's prior determination in Fund suit I. The fact that the Interim Policy results in different acts by the National Park Service does not mean a material change in the bison management program which the court approved in 1988.

Migrating bison which pose a threat to human health, safety, and welfare will be removed. The Park Service is still allowing the bison to migrate rather than containing them within the Park. Once outside the Park, game wardens for the Montana Department of Fish, Wildlife, and Parks, hunters who hold a special use permit, or National Park Service rangers may remove the bison. The only change is that Park Service rangers are now actively involved in assisting the State, and bison calves may be neutered and sold at auction. The effect on the bison as well as the surrounding environment is the same.

Significantly, the EA performed by the National Park Service and the State of Montana in 1985, which the court approved in 1988, actually contemplated assistance

by Park Service rangers. Therefore, even the fact that Park Service rangers are participating in controlling bison, or are doing so in concert with the State of Montana, is not a new or significant change from the prior bison control efforts.

Addition of new defendants does not negate application of claim preclusion to the Fund, at least with respect to the federal defendants. In this case, the Fund added the Secretary of Agriculture and the State of Montana. That cannot entitle Plaintiff to file the same suit the second time. The Secretary of Agriculture is involved through the United States Forest Service which manages lands adjacent to Yellowstone National Park Service. As such the Forest Service has agreed to cooperate with the Park Service and the State in developing a long-range bison management plan. The fact that a different federal defendant is involved does not change the principle. Where there is privity between the officers of the same government, a judgment in a suit between a party and a representative of the United States is res adjudicata in relitigation of the same issue between that party and another officer of the same government. *Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 401–402, 60 S.Ct. 907, 916–917, 84 L.Ed. 1263 (1940). "The crucial point is whether or not in the earlier litigation the representative of the United States had authority to represent its interest in a final adjudication of the issue in controversy." *Id.* at 403, 60 S.Ct. at 917. Here, there is no doubt but that the Secretary of Interior, the Director of the National Park Service, and the Superintendent of Yellowstone had authority to represent the United States' interest in the adjudication of the prior suit.

■ *Collateral Estoppel.* Even assuming that the Fund is not precluded from relitigating its claims against the United States, it is barred by collateral estoppel, or issue preclusion, from again litigating these same claims against the federal defendants as well as the State of Montana. Judicial efficiency, and indeed survival, demands that there be an end to litigation; an issue determined in one proceeding nor-

mally cannot be reexamined. *Gelb v. Royal Globe Insurance Co.*, 798 F.2d 38 (2nd Cir.1986), *cert. denied*, 480 U.S. 948, 107 S.Ct. 1608, 94 L.Ed.2d 794 (1987). In order for issue preclusion to apply, the issues in both proceedings must be identical; the issue in the prior proceeding must have been actually litigated and decided after a full and fair opportunity to be heard; and the decision must be necessary to support a valid and final judgment on the merits. *Id.* The possibility that new facts may surround the continuation of the basic conduct does not defeat preclusion unless it is shown that the new facts are relevant under the legal principles that will control the outcome of the decision. 18 Wright, Miller and Cooper, *Federal Practice and Procedure* 4417, pp. 154–155.

■ Here, the central issue is whether the proposed action of the defendants in allowing bison to migrate from the park and then allowing park rangers, game wardens or hunters, to remove them constitutes a major federal action requiring an EIS. This court previously held that such action was not a major federal action requiring an EIS and even if it were, there was no irreversible or irretrievable commitment of resources which would have a significant impact on the human environment. The decision on that issue was necessary to support a valid and final judgment on the merits in the prior case and the party against whom preclusion is asserted, the Fund, was a party to the earlier action. The Fund is therefore precluded from relitigating the question of whether NEPA has been complied with where relevant facts and law have not changed. The Interim Policy is identical in relevant part to the plan challenged in 1985.

■ *Requirement of EIS for the Interim Policy.* Even if the Fund's action were not barred by principles of res adjudicata and collateral estoppel, the court finds that the Fund cannot demonstrate that it will succeed on the merits of its claims in the instant suit. The Fund alleges under counts one and two of its complaint that 40 C.F.R. 1506.1(c) requires the defendants to complete an EIS before undertaking any

action under the Interim Policy.[2] However, this regulation applies only if the action taken would have an adverse environmental impact or limit the choice of reasonable alternatives. As well, 40 C.F.R. 1506.1(c) provides an exception to the requirement of an EIS if the action is covered by an existing program statement.

The evidence received at the hearing on plaintiff's motion clearly shows that continued removal of brucellosis-infected bison which migrate into Montana will not have an adverse environmental impact or limit the choice of reasonable alternatives. The bison herd has not been affected by past actions and there is no evidence to suggest that any action contemplated under the Interim Policy will result in depletion of the herd. The evidence shows that the bison herd has grown from about 20 at the turn of the century to approximately 3,000 animals. In spite of efforts to control the population, including removing 569 bison in 1988–1989, the herd has rebounded beyond its previous population levels. In fact, Dr. Mary Meagher estimates the herd contains an excess of 600 animals at the present time. Moreover, the evidence shows that the Northern herd is not biologically or genetically distinct from the rest of the Yellowstone bison; therefore, even substantial reduction of the Northern herd would have no significant impact on the Yellowstone bison. Finally, the evidence shows that the surrounding environment would not be affected by a reduction in the herd. Grizzly bears would not be affected by a reduction in the carrion which bison might provide due to number of bison available, the large number of elk, and feeding patterns of the bears in certain areas due to security cover.

The Interim Policy is exactly that, a short term policy put in place to protect Montana and its citizens while the agencies work out a long-term bison management plan. The present policy will in no way affect the agencies' future alternatives to control the bison, given its short-term na-

ture and the prolific health of the bison herd. The testimony of Drs. Meagher, Martinka, and Cameron compel this conclusion.

The Fund ignores the fact that there is an existing program statement prepared in 1985 by the Park Service and the State which covers interim management of the bison. (See State's exhibit D). The Park Service supplemented that program statement with an environmental assessment in 1990 (plaintiff's exhibit 3) and with the document prepared in May 1990 entitled, "Yellowstone Bison: Background and Issues" (plaintiff's exhibit 2). It is clear from these documents that the agencies have carefully considered the crucial factors and the various alternatives to manage the bison in the interim while a long-range plan is being developed, and reasonably concluded that the bison must be controlled now in order to protect the health, welfare, and safety of persons and livestock outside the park which may come into contact with migrating bison. Therefore, the Fund's allegation in count four of its amended complaint that the EA is inadequate also will likely fail. The Fund has alleged no facts which show that the actions under the Interim Policy may significantly degrade some human environmental factor. *Foundation For North American Wild Sheep v. United States, Dept. of Agriculture,* 681 F.2d 1172 (9th Cir.1982).

■ *Failure to Allege Claims Against the State and Eleventh Amendment Immunity.* The Fund has failed to allege claims against the State of Montana for which relief can be granted. In counts one through four of the amended complaint, the Fund alleges violations of federal law. The regulations cited all specifically apply to federal agencies. "The regulations that follow implement section 102(2) [of NEPA]. Their purpose is to tell *federal agencies* what they must do to comply with the procedures and achieve the goals of the

---

**2.** Count three alleges violation of 40 C.F.R. 1502.4. However, 1502.4 assumes the action contemplated is a major federal action requiring an EIS, therefore, the inquiry is still wheth-

er or not the action would have an adverse environmental impact. See 1508.18 and 1508.-27.

Act." 40 C.F.R. 1500.1(a) (emphasis added).

Count five alleges that the Montana Department of Livestock may take action to kill or destroy migrating bison if the Montana Department of Fish, Wildlife and Parks is not enjoined from doing so and as such the Department of Livestock is required to prepare an Environmental Impact Statement under the Montana Environmental Policy Act (MEPA). State agencies, however, need not prepare impact statements on speculative future action. Here, there is no evidence to show that the Department of Livestock has made an irrevocable commitment of resources, and therefore the Department is not required to prepare an EIS. *North Fork Preservation Assn. v. Dept. of State Lands,* 238 Mont. 451, 778 P.2d 862, 868 (1989).

Finally, where the complaint against the state defendants is based upon on state law, relief cannot be granted against the state or its officers consistent with the Eleventh Amendment unless immunity from suit has been waived by the state or Congress. *Pennhurst State School & Hospital v. Halderman,* 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). Here, there has been no waiver provided by Congress in the statutes at issue, nor has the State waived its immunity or the immunity of its officials acting in their official capacity.

*Conclusion.* The same parties, same lawyers, and even the same judge have grappled with these same issues before. Principles of res adjudicata and collateral estoppel, therefore, apparently bar Plaintiff's suit. Even so, the underlying facts and law would independently lead the court to the same result. The Fund, therefore, cannot show probable success on the merits, irreparable harm, or that its suit is in the public interest, or that the balance of hardship tips decidedly toward Plaintiff.

For all of these and the other reasons earlier summarized, the court has denied the requests for emergency injunctive relief.

The clerk is directed forthwith to notify counsel of entry of this order.

Done and dated this 25 day of January, 1991.