GREATER YELLOWSTONE
COALITION, et al.,
Plaintiffs,

v.

Bruce BABBITT, et al., and State of
Montana, et al., Defendants.

No. CV 96–82–H–CCL.

United States District Court,
D. Montana,
Helena Division.

Feb. 4, 1997.

James S. Angell, Sierra Club Legal Defense Fund, Bozeman, MT, for Plaintiffs.

Martin J. LaLonde, Geoffrey Garver, U.S. Dept. of Justice, Environment and Natural Resources Division, Washington, DC, Sherry S. Matteucci, United States Attorney, Billings, MT, for Defendants.

W.D. Hutchison, Assistant Attorney General, Helena, MT, for Defendants-Intervenors.

## ORDER

LOVELL, District Judge.

Before the court is Plaintiffs' motion for stay pending appeal. Defendants and Defendant–Intervenors have filed briefs in opposition, and the court is ready to rule. Brief review of the background of this issue may provide needed perspective.

The Yellowstone National Park ("YNP" or "the Park") bison herd numbered some two dozen at the beginning of this century. In order to increase herd size, federal managers imported domesticated bison from Texas and Montana. Corrals and barns were established. The YNP bison herd was actually tended by rangers. YNP bison were regularly fed, herded, vaccinated, corralled, fenced, and in all respects treated as domesticated livestock.

For decades herd size and disposition was monitored and controlled by shooting bison *inside* the Park.

By approximately mid-century, the National Park Service ("NPS") knew that the YNP bison herd was infected with brucellosis, a bacterial disease that causes female bison and livestock to abort their fetuses and causes undulant fever in humans. Undulant fever is a serious, sometimes fatal disease in humans, and is one of the diseases that led to the pasteurization of milk in this century. There is apparently no fully effective vaccine that can be given to bison to prevent the spread of brucellosis. Many domestic livestock herds have been destroyed to the last animal under a national campaign to eradicate brucellosis, with over one billion dollars spent in the effort. At great cost, the State of Montana achieved brucellosis-free status in 1985, a status that requires Montana to prevent any reintroduction of brucellosis to the State.

In 1967, NPS ceased its bison ranching activities and decided to allow these infected domesticated animals to reproduce and wander at will and without supervision. The YNP bison herd, which had numbered approximately 1,477 in 1954, steadily increased its size. By 1988, there were some 2,800 bison in the Park. In the fall of 1988, there were approximately 3,159 bison in the Park. Although 569 bison were removed by shooting during the winter of 1988–89, the herd size rebounded to 3,178 by 1990. This court has previously found the carrying capacity of the Park to be not more than 2,400 bison. *See Fund for Animals v. Lujan,* 794 F.Supp. 1015, 1018–19 (D.Mont.1991), *aff'd,* 962 F.2d 1391 (9th Cir.1992). By the spring of 1996, the herd was approximately 1,000 animals over carrying capacity.

As bison numbers grew and the Park groomed roads for winter use by snowmobiles and snow coaches, bison from this overly-large herd have increasingly sought to leave the Park to feed in Montana.

Montana has thus found itself in the unenviable position of having to protect its borders from this infected herd by shooting bison as they enter Montana in order to prevent spread of this disease. This court ruled in *Lujan, supra,* that Montana had the absolute right, under its police power, to shoot bison from this brucellosis-infected herd when they entered Montana. Plaintiffs concede this and their objection is limited to shooting bison within the Park.

Interestingly, since Plaintiffs' objection is limited to the shooting of bison within the Park, even if Plaintiffs were to succeed, it would not stop the killing of excess wandering bison.

The joint management plan agreed upon by the State of Montana and the United States (the "1996 Interim Plan") seeks to preserve the integrity of the YNP herd while protecting the interests of the State of Montana. It contains a contingency provision that if historical mortality levels are met or exceeded, the parties may rely more heavily upon non-lethal methods to manage bison. Such contingency planning is now in effect, with the NPS having suspended its capture operation at Reese Creek; the NPS is currently holding and feeding bison that otherwise would have been shipped to slaughter. NPS is also increasing its hazing efforts to

**1448**

keep the bison from exiting the Park in this area.

For all of these reasons, for the reasons stated in the December 19, 1996, opinion, and for the reasons cited by the Defendants in their briefs, the court finds that the Plaintiffs have failed to make an adequate showing that they will be irreparably harmed absent a stay. The integrity of the YNP bison herd is in no way threatened. I believe the bison would be more harmed by the proposed stay than by the 1996 Interim Plan.

Like the three preceding "bison cases" filed in this court, this bison case has been too easily colored by argument based on emotion. Reasonable resolution of the difficult issues in this case requires logical thought and action.

I believe the interim agreement is still viable and (if observed) can provide a workable solution until the long-range planning process is completed. The federal-state parties, with experts on both sides, have gotten along reasonably well and there has been cooperation in the field, although some dissension has occurred. In this regard, the parties might well heed Dr. Franklin's advice about hanging together.

The court is confident that not only the parties but also the bison will benefit from continued cooperation between federal and state officials.

It is also plain to the court that a stay is not necessary or warranted and could prove more detrimental to the bison than the interim plan. Accordingly,

IT IS HEREBY ORDERED that Plaintiffs' motion for stay pending appeal is DENIED.

The Clerk is directed forthwith to notify the parties of entry of this order.