**INTERTRIBAL BISON COOPERATIVE, et al., Plaintiffs,**

v.

**Bruce BABBITT, et al., Defendants.**

**GREATER YELLOWSTONE COALITION, et al., Plaintiffs,**

v.

**Bruce BABBITT, et al., Defendants.**

Nos. CV 97–30–H–CCL, CV 96–82–H–CCL.

United States District Court,
D. Montana,
Helena Division.

Nov. 5, 1998.

## OPINION and ORDER

LOVELL, District Judge.

Plaintiffs' consolidated actions (hereinafter *ITBC* and *GYC*, respectively) challenge administrative decisions of the Defendants and seek to enjoin the agreement reached between Montana and the federal government for management of the Yellowstone National Park bison herd. The court finds that Plaintiffs have standing to sue. The cases came on regularly on September 11, 1998, for trial on the merits, into which trials were merged hearing on Defendants' consolidated motions for summary judgment and the *ITBC* Plaintiffs' motion for preliminary injunction.* Having heard the arguments of the parties

and having reviewed and considered the administrative record and the motions and briefs, the court is prepared to rule. The following opinion and order also represents the court's findings of fact and conclusions of law. Fed.R.Civ.P. 52(a).

The Yellowstone National Park ("YNP") bison herd of 2,500 or more animals is at or above YNP carrying capacity. *See Fund for Animals, Inc. v. Lujan,* 794 F.Supp. 1015, 1018 (D.Mont.1991) (Park capacity is approximately 2,400 bison.). Particularly when the YNP bison herd exceeds Park capacity and when the Park experiences a harsh winter interfering with the herd's food supply within the Park, the herd tends to migrate north and west from the Park in search of additional forage. Uncontrolled migration of brucellosis-infected bison into Montana presents a danger to the Montana livestock industry and a health risk to humans. *Id.* at 1018. Migrating bison also present a significant risk of property damage outside the Park. *Id.* at 1019.

The YNP bison herd is genetically and numerically healthy and has recovered from the high mortality of the winter of 1996–97. The integrity and viability of the YNP herd is in no way threatened or endangered.

*Genesis of 1996 Interim Plan*

The size of the YNP bison herd has fluctuated repeatedly in this century. At the turn of the century the herd consisted of approximately 23 bison within the Park. The NPS imported domestic bison from Montana and Texas to enlarge the herd. The herd was managed as livestock, with YNP rangers cowboying the herd with the use of corrals and barns. By mid-century, the herd size was well over 1,000. The NPS reduced herd size to 397 animals in 1967. NPS then decided to discontinue its bison management program and allow the herd to roam free. In 1988 there were approximately 2,800 bison in

---

* The court set down the *ITBC* Plaintiffs' motion for preliminary injunction for hearing on December 16, 1997. At the beginning of that hearing the court granted Plaintiffs' motion for consolidation of their preliminary injunction motion with trial on the merits. After determining that the court did not then have a sufficient factual basis for deciding the case, the court continued the hearing without date, and ordered the Defen-

dants to submit weekly written status reports informing the court of the current conditions of the Park and the status of the bison herd and federal and state efforts to manage migrating bison. The court also ordered that no more than 100 bison may be shot without further hearing before the court. The matter was then set down for trial on different dates finally coming on regularly to be heard on September 11.

the Park, and by 1995 the number reached approximately 3,900 bison.

As the YNP bison herd became larger, portions of the herd began to migrate out of the Park during harsh winters in search of food. As early as 1968, NPS embarked on a boundary protection program which involved NPS personnel shooting bison at the Park boundaries. NPS later discontinued this program, but eventually the State of Montana began a similar program on its side of the YNP boundary because of its concerns of private property damage, conflicts with humans, and disease transmission.

■ Montana has the right under its police powers to protect the health, safety, and welfare of its inhabitants by removing possibly infected YNP bison that migrate into Montana. *Fund for Animals, Inc. v. Lujan,* 794 F.Supp. 1015 (D.Mont.1991). In 1985 the Montana legislature authorized public hunting of migrating bison as a method of helping to control this problem. During the winter of 1988–89 large migrations of YNP bison resulted in the killing of 569 YNP bison within the State of Montana. Apparently because of negative publicity generated by these large-scale public hunts, Montana ended them and resumed control efforts of migrating bison through its agencies.

The State of Montana became increasingly dissatisfied with its boundary management role and the refusal of YNP to manage its bison. This culminated in suit against the federal government in 1995. *State of Montana v. United States,* CV 95–6–H–CCL (January 17, 1995). That litigation was settled with an agreement between Montana and the United States to prepare an interim bison management plan. After preparation of an Environmental Assessment, a Finding of No Significant Impact, and final agreement by the State of Montana and the federal agencies, the 1996 Interim Plan was implemented.

The 1996 Interim Plan called for increased cooperation between the two governments and for increased responsibilities for boundary management by the NPS. Important features of the 1996 Interim Plan were that the NPS agreed to prevent bison from migrating onto private land in the Reese Creek area by capturing such bison, if necessary, and shipping them to slaughter. The 1996 Interim Plan called for increased tolerance of migrating bison on federal lands adjacent to YNP, and a program of capture and testing in the West Yellowstone area, with bison testing seronegative for brucellosis to be marked and released.

The 1996 Interim Plan also contained procedures for emergency situations. Such contingency plans were put into effect during the winter of 1996–97 when, due to harsh winter conditions, more YNP bison were destroyed than was previously contemplated.

As a result of the experience of the parties with the 1996 Interim Plan during the unusually harsh winter of 1996–97, which resulted in some 1,100 bison being killed by government personnel and an additional number dying due to weather conditions, the 1996 Interim Plan was modified. After reevaluating the circumstances of YNP bison and the proposed modifications to the Plan, the parties agreed to implement the modified plan in December, 1997 (the "1997 Interim Plan").

*GYC Case: Findings and Conclusions*

This court denied the *GYC* Plaintiffs' motion for preliminary injunction on December 19, 1996. Plaintiffs had sought to enjoin implementation of the Interim Bison Management Plan (the "1996 Interim Plan"), which was prepared by NPS, Montana, and the Animal and Plant Inspection Service ("APHIS"), for the purpose of managing bison in and around the Park. The 1996 Interim Plan was finalized after preparation of an environmental assessment ("EA") and issuance of an NPS Finding of No Significant Impact ("FONSI") and Montana's Decision Notice.

In denying Plaintiff GYC's motion for preliminary injunction, this court held that it was not likely that Plaintiffs would succeed on the merits of their claims, that Plaintiffs had failed to show the likelihood of irreparable harm or a balance of hardships tipping in their favor, and that the public interest was not harmed by the 1996 Interim Plan. In the December, 1996, *GYC* opinion, the court described the background of the *GYC* case and made numerous findings of fact and conclu-

sions of law, which the court incorporates herein by reference. *See Greater Yellowstone Coalition v. Babbitt,* 952 F.Supp. 1435 (D.Mont.1996). This decision was affirmed on appeal. *See Greater Yellowstone Coalition v. Babbitt,* 108 F.3d 1385, 1997 WL 121046 (9th Cir.1997).

In *GYC,* Plaintiffs challenge the 1996 Interim Plan with three claims brought under the Administrative Procedures Act and two claims under NEPA.

*APA Claims:*

1. National Park Service Organic Act, 16 U.S.C. § 1.

This statute provides that the fundamental purpose of the National Park Service is to "conserve the scenery and the natural and historic objects and the wildlife therein..." of the national parks. 16 U.S.C. § 1. All parties agree that NPS must protect and conserve YNP bison.

██ Plaintiffs argue that NPS cannot destroy any YNP bison. NPS counters that part of its overall protection of the YNP bison herd may require it to destroy individual bison pursuant to the 1996 Interim Plan. NPS further argues that the alternative to the 1996 Plan is to return to indiscriminate destruction of bison as they leave the Park, as provided by the 1992 Interim Plan or as has occurred historically without the benefit of any federal-state cooperative agreement. NPS asserts that the Organic Act has provided it with broad discretion to manage and regulate the Park and its wildlife to best achieve the conservation mandate. *See Bicycle Trails Council of Marin v. Babbitt,* 82 F.3d 1445, 1454 (9th Cir.1996), *quoting National Wildlife Federation v. National Park Service,* 669 F.Supp. 384, 390 (D.Wyo.1987). NPS interprets its Congressional mandate to allow it to determine whether selective removal of individual bison protects and conserves the YNP bison herd. The court defers to reasonable agency interpretations of statute. *See Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843–44, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

2. National Park Service Organic Act, 16 U.S.C. § 3.

██ This statute states that the Secretary of the Interior "may also provide in his discretion for the destruction of such animals and of such plant life as may be detrimental to the use of any of said parks, monuments, or reservation." 16 U.S.C. § 3. Plaintiffs argue that because this is the sole statute providing for destruction of wildlife in the Park, a finding of detriment is necessary before Park wildlife can be destroyed. NPS disagrees, taking the position that the conservation mandate of 16 U.S.C. § 1 provides NPS with the requisite authority to destroy wildlife in the Park. The court also notes that one other statute authorizes NPS to "sell *or otherwise dispose* of the surplus buffalo of the Yellowstone National Park herd...." 16 U.S.C. § 36 (emphasis supplied). Plaintiffs believe that because § 3 focuses on destruction of wildlife, only that statute is pertinent to the inquiry, citing *Tang v. Reno,* 77 F.3d 1194, 1197 (9th Cir.1996). That opinion simply discusses the black letter rule of interpretation that "an item which is omitted from a list of exclusions is presumed not to be excluded." *Id.* However, we are not looking at a list of exclusions, and this court is not prepared to define conservation to exclude destruction or removal of wildlife merely because Congress specified in § 3 that the Secretary may in his discretion provide for the destruction of wildlife detrimental to the use of the Park.

There is no statutory requirement that the Secretary make a finding of detriment to justify the destruction of wildlife. The court agrees with NPS that pursuant to § 3 of the Organic Act and NPS policy a finding of detriment is necessary to justify a controlled harvest, *see* 48 Fed.Reg. 30,264 (June 30, 1983), but an explicit finding of detriment is not otherwise necessary to justify destruction of wildlife, especially when serving the broader conservation goals of section one of the Organic Act. It is significant that section three, unlike section one, permits destruction of YNP wildlife to serve non-conservation goals. For example, section three would permit destruction of wildlife when wildlife causes detriment to the physical facilities or

structures in YNP. In this sense, section three is a broader statute because it extends beyond the conservation mandate of section one.

3. Yellowstone Organic Act, 16 U.S.C. § 26.

■ Plaintiffs rely on § 26 of the Yellowstone Act, which provides that "[a]ll hunting, or the killing, wounding or capturing at any time of any bird or wild animal, except dangerous animals, when it is necessary to prevent them from destroying human life or inflicting an injury, is prohibited within the limits of said park...." 16 U.S.C. § 26. This statute criminalizes poaching by members of the general public. *Frost v. Garrison*, 201 F.Supp. 389, 390 (D.Wyo.1962). However, this anti-poaching statute does not limit the authority of NPS to destroy YNP wildlife pursuant to properly prepared wildlife management plans, and if this were not the case there could never be controlled harvests of wildlife.

Furthermore, § 26 applies on its face to "persons" and makes no explicit mention of the sovereign or government agencies. *See United States v. Cooper Corp.*, 312 U.S. 600, 604, 61 S.Ct. 742, 85 L.Ed. 1071 (1941) ("Since in common usage the term 'person' does not include the sovereign, statutes employing the phrase are ordinarily construed to exclude it."). This fact, when combined with the obvious purpose of the criminal statute as an anti-poaching provision and also with the legislative history confirming that purpose, leads the court to conclude that the 1996 Interim Plan does not violate § 26 of the Yellowstone Act.

*NEPA Claims:*

1. Failure to prepare an EIS.

The *GYC* Plaintiffs challenge the NPS determination that the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*, did not require preparation of an EIS before the 1996 Interim Plan was implemented. This challenge calls into question the August 1996 Finding of No Significant Impact ("FONSI") upon which the 1996 Interim Plan was based. However, it is clear that, in preparing the FONSI, NPS analyzed the appropriate criteria (provided by 40 C.F.R.

§ 1508.27) before it came to the conclusion that a complete EIS was not necessary prior to implementing the 1996 Interim Plan.

2. Failure to consider requirements of 40 C.F.R. § 1506.1(c).

■ Plaintiffs also argue that 40 C.F.R. § 1506.1(c) prohibits major federal action which significantly affects the quality of the human environment when "work on a required program environmental impact statement is in progress...." Plaintiffs here point to the Environmental Impact Statement which is currently being prepared by the Defendants in pursuit of a long-range bison management plan. As the court noted previously, however, this argument might be valid but for the fact that NPS issued a FONSI that defined the 1996 Interim Plan not to be a major federal action significantly affecting the quality of the human environment. Therefore, 40 C.F.R. § 1506.1(c) does not apply to the 1996 Interim Plan, and this argument is without merit.

*GYC Conclusions:*

■ After considering the facts and circumstances of this case, and after review of the administrative record, the court concludes that the Finding of No Significant Impact issued by NPS in August 1996 was not arbitrary and capricious. Both the FONSI and the 1996 Interim Plan are reasonable and consistent with the NPS Organic Act and the Yellowstone Act. Defendants did not violate NEPA by failing to prepare an EIS for the 1996 Interim Plan, because that plan was sufficiently justified and supported by an Environmental Assessment and a Finding of No Significant Impact.

*ITBC Case: Findings and Conclusions*

Following the winter of 1996–97 and the mortality of over 1,500 YNP bison, the Defendants reexamined the 1996 Interim Plan to determine whether it should be modified. The Defendants also considered whether a new environmental assessment was necessary under NEPA, and determined that it was not. The Defendants prepared an "Evaluation of Adjustments to Interim Bison Management Plan, Winter 1997–1998," dated

November 24, 1997, which concluded that an adjusted Interim Plan would have no impact on peregrine falcons, bald eagles, or grizzly bears. The evaluation considered numerous other factors, all of which were determined not to be significantly impacted by the adjusted interim plan. Eventually, the Defendants did modify the 1996 Interim Plan (hereinafter referred to as the "1997 Interim Plan").

■ Plaintiffs seek to enjoin the operation of a capture facility at Reese Creek as called for by the 1997 Interim Plan. Plaintiffs assert that operation of the Reese Creek bison capture facility violates the Organic Act because it involves capture and shipment for slaughter of YNP bison before they exit YNP. However, despite the fact that the capture operation in Reese Creek calls for certain bison to be shipped to slaughter, Defendants have demonstrated that the capture facility reduces overall bison mortality because it calls for testing and holding of seronegative bison. Such migrating bison would otherwise be destroyed by the State of Montana. NPS argues that up to 150 bison annually will be saved due to the operation of the Reese Creek capture facility. In addition, the 1997 Interim Plan calls for increased tolerance of YNP bison in the West Yellowstone area and other areas outside YNP, saving the lives of additional migrating YNP bison.

The *ITBC* Plaintiffs' basic objection is essentially the same as the *GYC* Plaintiffs' objection—that NPS is not allowed by the Organic Act to destroy Park bison. However, the relevant statutes do provide adequate discretionary authority to the Secretary and the NPS to permit the removal of surplus bison, to permit the removal of bison posing a danger or a detriment to the use of the Park, and to permit the removal of bison for the overall purpose of protecting and conserving the YNP bison herd.

The court concludes that neither the decision to implement the 1996 Interim Plan nor the decision to implement the 1997 Interim Plan was arbitrary or capricious or otherwise not in accordance with the law. Neither were the Interim Plans implemented in violation of NEPA. Both plans were prepared and

implemented well within the discretion and statutory authority of the NPS to manage the Park bison. Were the 1996 and 1997 Interim Plans to be struck down, the default plan would be either the 1992 Interim Plan or no cooperative agreement whatsoever. Either default would lead to even more YNP bison being destroyed than is currently contemplated under the 1997 Interim Plan. The value of the 1997 Interim Plan is that it reduces and tends to eliminate the killing of YNP bison posing no disease threat to domestic cattle. Additionally, preparation of a new Environmental Assessment or EIS would not add appreciably to the information currently possessed by the parties but would waste valuable resources that should be devoted to the preparation of the long-range EIS now in the final stages of completion.

### Conclusion

For the reasons set forth in this memorandum opinion and order, and based upon the findings of fact and conclusions of law contained herein, the court concludes that Plaintiffs have wholly failed to prove that the Defendants' decisions to implement the 1996 Interim Plan or the 1997 Interim Plan were arbitrary or capricious or otherwise not in accordance with the law. Likewise, Plaintiffs have failed to show that implementation of the 1997 Interim Plan should be enjoined. Plaintiffs have failed to show irreparable harm to their aesthetic, emotional, religious, and cultural interests arising from the 1997 Interim Plan, which in fact serves to reduce bison mortality. The parties recognize that this bison herd is a national treasure within YNP. The integrity of the YNP bison herd is strong. The herd has once again rebounded to the point that herd size has reached and may now exceed YNP capacity. The balance of harms tips in favor of . the Defendants; these cooperating governments are working diligently to preserve and protect these thousands of bison, some of which migrate across political boundary lines in the greater yellowstone ecosystem. These governments and their officers (especially Superintendent Michael Finley and Governor Marc Racicot) should be commended for their yeoman efforts to protect both the YNP bison and the sometimes competing interests of their citi-

zens. Enjoining the 1997 Interim Plan is clearly not in the public's interest.

Accordingly,

IT IS HEREBY ORDERED that the *ITBC* Plaintiffs' motion for preliminary injunction is DENIED.

IT FURTHER ORDERED that the Federal Defendants' motion for summary judgment in both the *GYC* and *ITBC* cases is GRANTED.

IT IS FURTHER ORDERED, as to *GYC* and those Plaintiffs' complaint, that all relief is DENIED.

IT IS FURTHER ORDERED, as to *ITBC* and those Plaintiffs' complaint, that all relief is DENIED.

The Clerk is directed forthwith to notify the parties of entry of this order.