375 F.3d 884
 COLD MOUNTAIN; Cold Rivers, Inc.; Buffalo Field Campaign; Ecology Center, Inc., Plaintiffs-Appellants,
v.
David P. GARBER, Supervisor, Gallatin National Forest; United States Forest Service; Dale Bosworth, Chief of the U.S. Forest Service; Ann Venneman, Secretary of Agriculture; Fish and Wildlife Service; Gale A. Norton, Secretary of the Department of the Interior; National Park Service, Defendants-Appellees.
 No. 03-35474.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted March 1, 2004.
 Filed July 14, 2004.
 As Amended August 9, 2004.
 
 COPYRIGHT MATERIAL OMITTED Thomas J. Woodbury (argued), Missoula, MT, for the plaintiffs-appellants.
 Thomas A. Sansonetti, Assistant Attorney General; David Shilton, John Almeida, Susan Henderson, and Susan Pacholski (argued), Attorneys, Environment and Natural Resources Division, U.S. Department of Justice, Washington, DC, for the defendants-appellees.
 John Bloomquist and David R. Stewart, Helena, MT, filed a brief for amicus curiae Montana Department of Livestock in support of the defendants-appellees.
 Appeal from the United States District Court for the District of Montana; Charles C. Lovell, District Judge, Presiding. D.C. No. CV-01-00027-CCL.
 Before O'SCANNLAIN, RYMER, and BYBEE, Circuit Judges.
 O'SCANNLAIN, Circuit Judge.
 
 
 1
 We must decide whether the United States Forest Service's issuance of a permit to operate a bison capture facility in Montana violated the Endangered Species Act or the National Environmental Policy Act.
 
 
 2
 * On the precipice of extinction in the early twentieth century, the Yellowstone bison herd has been pulled back from the brink by careful management.[1] Yet the annual migration of bison out of Yellowstone National Park's western boundary poses risks to the health of nearby livestock in Montana. See Fund for Animals, Inc. v. Lujan, 794 F.Supp. 1015, 1018 (D.Mont.1991). The bison may carry brucellosis, a bacterial organism that causes female bison to abort fetuses. Id. at 1019. Brucellosis causes sterility and abortions in livestock and undulant fever in humans. Id. There is no vaccine or cure for brucellosis, and more than $1 billion has been spent on eradication efforts nationwide. Id. More than 50 percent of the Yellowstone herd tested positive for brucellosis in 1988. Id.
 
 
 3
 After a thirty-year, $30-million effort, Montana eradicated brucellosis in 1985. Id. Because the state is brucellosis-free, it may ship livestock out of state without testing, saving $1 to $2 million per year. Id. Montana requires that all untested brucellosis-exposed bison that enter the state be destroyed if they pose a transmission risk.
 
 
 4
 In order to protect Montana's brucellosis-free status while maintaining a wild, free-ranging population of bison and minimizing destruction, the Montana Department of Livestock ("MDOL"), other state agencies, and the National Park Service, the United States Forest Service ("Forest Service"), and other federal agencies, together formulated an Interim Bison Management Plan (the "Bison Plan") in 1995.[2] The Bison Plan provides for monitoring, brucellosis testing, removing infected and exposed bison, and the "hazing" — i.e., herding — of bison back into Yellowstone. Hazing can be done in a variety of ways: on foot, on horseback, on snowmobiles, on all-terrain vehicles, on motorcycles, in helicopters; it also sometimes involves the shooting of "cracker shells" to induce the bison to move.
 
 
 5
 As part of its effort to comply with the Bison Plan, the MDOL applied in 1998 for a ten-year Special Use Permit (the "Permit") from the Forest Service to operate a bison-testing facility in the Gallatin National Forest, just outside Yellowstone's western boundary, in an area north of the Madison Arm of Hebgen Lake known as the Horse Butte area. The facility, called the Horse Butte Bison Capture Facility, is a temporary structure, consisting of several holding pens and work areas. Although the primary facility measures approximately 100 by 300 feet, the entire facility occupies one to two acres of land. The Permit authorized the MDOL to operate the capture facility from November 1 to April 30.
 
 
 6
 Before issuing the Permit, the Forest Service prepared a Biological Assessment ("BA") in accordance with its obligations under the Endangered Species Act ("ESA"). See 16 U.S.C. § 1536(c). That document assessed what it deemed the "cumulative effects area" for the proposed capture facility: approximately 15 square miles of public and private lands "contained within the boundary north of the Madison Arm of Hebgen Lake and the Madison River, east of Hebgen Lake, south of the Grayling Arm of Hebgen Lake and Cougar Creek, and west of Y[ellowstone] N[ational] P[ark] .... generally described as the Horse Butte/Flats area."
 
 
 7
 Within this area are three bald eagle nests, denominated Horse Butte, Ridge, and Narrows. Bald eagles are considered "threatened" for purposes of the ESA. See 50 C.F.R. § 17.11. Under the Montana Bald Eagle Management Plan and the Greater Yellowstone Bald Eagle Management Plan, areas within a .25-mile and a .5-mile radius of active and alternative nests are known respectively as Zone I and Zone II. The eagle management plans restrict human activity in these zones.
 
 
 8
 Because the preferred site for the proposed capture facility was within Zone II of the Horse Butte nest, the BA particularly examined the possible effects of the facility's operation on that nest. The Forest Service ultimately concluded that the cumulative effects of existing human activities, the use of snowmobiles for recreation and hazing, and the operation of the facility necessitated a finding that the facility "may affect/likely to adversely effect" bald eagles in the Horse Butte/Flats area.
 
 
 9
 Acting under its obligation to consult formally with the United States Fish and Wildlife Service ("USFWS"), the Forest Service transmitted the BA to the USFWS on November 30, 1998. See 50 C.F.R. § 402.14(a). The Forest Service then issued an Environmental Assessment ("EA") of the effects of the proposed Permit on December 14, 1998. The Forest Service again concluded, in its EA, that the Horse Butte nest site might be affected by increased levels of human activity resulting from the capture facility's operation.
 
 
 10
 The USFWS in turn issued a Biological Opinion ("BiOp") on December 18, 1998. In the BiOp, the USFWS determined that the capture facility "was not likely to jeopardize the Pacific region bald eagle population[.]" But the USFWS agreed with the Forest Service that some eagles "may [be] adversely affect[ed.]" As part of the BiOp, therefore, the USFWS issued an Incidental Take Statement (the "Statement"). The Statement anticipated that the capture facility's operation might lead to the reproductive failure of the Horse Butte nest and thus involve a "take" of threatened bald eagles under § 9 of the ESA. See 16 U.S.C. § 1538(a)(1)(B) (making it unlawful for any person to "take any such[listed] species within the United States"). Under the ESA, a take committed pursuant to an incidental take statement is not considered a prohibited taking. See 16 U.S.C. § 1536(o)(2). As a non-discretionary term and condition of the Statement, the USFWS specifically incorporated bison hazing requirements appended to the EA and repeated earlier in the BiOp.
 
 
 11
 These restrictions banned helicopter hazing in Zones I and II from February 1 to August 15. Shooting was also prohibited in Zone I. During snowmobile season, hazing activities in Zone I were allowed only on designated trails, south of Forest Road 610, and by permission of the local Gallatin Forest Ranger District. Off-road and -trail hazing by snowmobile and horseback was permitted in Zone II, although it was to be kept to a minimum. ATVs, motorcycles, and shooting were permitted only along Forest Road 610 and the lookout road. Outside of Zones I and II, helicopter hazing was prohibited in the "Horse Butte area."
 
 
 12
 The Forest Service issued a Decision Notice and a Finding of No Significant Impact ("FONSI") on January 29, 1999, and awarded the Permit to the MDOL on March 17, 1999.
 
 
 13
 Convinced that the bison hazing restrictions were being violated by the MDOL, Cold Mountain, Cold Rivers, Inc., a nonprofit environmental and human rights organization based in Missoula, Montana, joined by the Buffalo Field Campaign and the Ecology Center, Inc. (collectively "Cold Mountain"), sent a Notice of Intent to Sue for violations of the ESA to state and federal officials on April 27, 2000.[3] The Forest Service investigated Cold Mountain's allegations of hazing violations, but determined that they were unfounded.
 
 
 14
 Cold Mountain then sued the MDOL, the Forest Service, the National Park Service, and various federal officers in United States District Court for the District of Montana in May 2001. Cold Mountain's complaint alleged that the state and federal defendants had consistently violated the terms of the Permit and the Statement, resulting in a take of protected bald eagles under § 9 of the ESA. The complaint also faulted the federal defendants for not conducting adequate environmental analysis under the National Environmental Policy Act ("NEPA"), and alleged violations of the Migratory Bird Treaty Act ("MBTA"), the Administrative Procedures Act ("APA") itself, the National Forest Management Act ("NFMA"), and the Permit. Cold Mountain asked the district court (1) to declare that the relevant statutes had been violated; (2) to void the Permit; (3) to enjoin the operation of the capture facility; (4) to require the federal agencies to conduct analysis under the ESA and NEPA; or, alternatively, (5) to enforce the terms of the BiOp and to prohibit helicopter hazing in the Horse Butte area.
 
 
 15
 The district court granted summary judgment for the state and federal defendants on March 28, 2003. Specifically, the district court concluded that no prohibited take of bald eagles had been established. The court also agreed with the Forest Service's conclusion that the restrictions on helicopter hazing had not been violated. The court determined that the Forest Service's EA was adequate, that the Service's decision not to prepare an Environmental Impact Statement was reasonable, and that NEPA was therefore not violated. The court granted summary judgment to the MDOL on sovereign immunity grounds.[4] And the court also ruled in favor of the federal defendants on the MBTA, NFMA, and APA counts.[5] Cold Mountain's timely appeal followed.
 
 II
 
 16
 * The ESA makes it illegal to "take any such [listed endangered] species within the United States." 16 U.S.C. § 1538(a)(1)(B). The statute defines "take" to mean "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct[,]" id. § 1532(19), and includes federal agencies, officers, and employees among those defined as "persons" liable for a taking, id. § 1532(13). Implementing regulations promulgated by the Secretary of the Interior further define "harass" as "an intentional or negligent act or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding, or sheltering." 50 C.F.R. § 17.3.
 
 
 17
 Cold Mountain first contends that the Forest Service's failure to enforce the hazing restrictions in the BiOp's Incidental Take Statement amounts to a prohibited take of bald eagles in violation of the ESA. Pointing to eyewitness affidavits, videotape footage, and photographs that purport to demonstrate violations of the hazing restrictions by the MDOL, Cold Mountain alleges that these violations resulted in the reproductive failure of the Ridge nest in 2000. The Forest Service's omission in failing to hold the MDOL to the restrictions on helicopter and other methods of hazing, Cold Mountain asserts, has thus led to the "harassment" of bald eagles in the Horse Butte area.
 
 
 18
 The federal defendants respond by pointing out that any alleged hazing violations were committed by the MDOL, which is no longer a party to this appeal. Thus, even assuming for the sake of argument that a take has occurred (which the federal defendants strongly dispute), it should be charged to the account of the MDOL, not the Forest Service or any other federal agency. In sum, the federal defendants object to what they characterize as an unprecedented theory of liability under the ESA, in which the Forest Service is vicariously liable for the prohibited takes of its permittee, the MDOL.
 
 
 19
 We need not reach the novel question of the Forest Service's liability under the ESA for the actions of its permittees, however, because we are satisfied that there is no genuine issue for trial. See Far Out Prods., Inc. v. Oskar, 247 F.3d 986, 992 (9th Cir.2001) ("An issue is `genuine' only if there is sufficient evidence for a reasonable fact finder to find for the non-moving party.") (citation omitted). See Defenders of Wildlife v. Bernal, 204 F.3d 920, 927 (9th Cir.2000); Palila v. Hawaii Dep't of Land and Natural Res., 852 F.2d 1106, 1109 (9th Cir.1988). Cold Mountain has failed to establish a causal link between any alleged hazing violations and the Ridge nest failure. See Pyramid Lake Paiute Tribe v. U.S. Dep't of the Navy, 898 F.2d 1410, 1420 (9th Cir.1990) ("The evidence does not establish that any one year's diversions of Project water has actually caused the cuiui's spawning problems.") (emphasis added); cf. Marbled Murrelet v. Babbitt, 83 F.3d 1060, 1066 (9th Cir.1996) ("A reasonably certain threat of imminent harm to a protected species is sufficient for issuance of an injunction under section 9 of the ESA."); Forest Conservation Council v. Rosboro Lumber Co., 50 F.3d 781, 787 (9th Cir. 1995) (discussing Pyramid Lake in the context of a preliminary injunction claim and explaining that "the defect of the plaintiff's claim lay in the lack of a causal connection between the challenged action and the alleged injury to the protected species"). Cold Mountain offers only scientific studies (primarily in the form of abstracts) that suggest that noise from helicopters causes eagles to react by turning their heads or flying from a perch. But the studies do not appear to have actually studied or measured the effects of aircraft noise on the reproductive success of bald eagles. And the record is bereft of specific evidence linking the Ridge nest failure to the alleged hazing violations.[6]
 
 
 20
 Because the record discloses no genuine issue of material fact requiring trial, we affirm the district court's grant of summary judgment on Cold Mountain's take claim.
 
 B
 
 21
 Cold Mountain next argues that the Forest Service was required to reinitiate formal consultation with the USFWS after the Ridge nest's reproductive failure in 2000 because that failure exceeded the permissible take under the Statement. Reinitiation is also required, Cold Mountain continues, because it has provided "new information" in the form of affidavits outlining previously unconsidered effects of hazing operations on bald eagles.
 
 
 22
 The federal defendants respond that Cold Mountain did not raise this claim before the district court, which therefore did not rule on the issue.
 
 
 23
 The federal defendants' position finds support in the record, which reveals that Cold Mountain only mentioned the Forest Service's failure to reinitiate consultation as part of a broader claim that any violation of the Statement constituted a taking per se under the ESA. The reinitiation claim was thus not presented by Cold Mountain or evaluated by the district court as a freestanding request for relief. Indeed, Cold Mountain's amended complaint and other pleadings nowhere allege that the Forest Service should have reinitiated consultation with the USFWS after the Ridge nest failure. Understandably, then, the district court did not evaluate the failure to reinitiate consultation as itself a separate violation — either procedural or substantive — of the ESA.
 
 
 24
 In general, we do not consider an issue raised for the first time on appeal. See Foti v. City of Menlo Park, 146 F.3d 629, 638 (9th Cir.1998); Bolker v. Comm'r, 760 F.2d 1039, 1042 (9th Cir.1985). We may invoke our discretion to hear previously unconsidered claims under three recognized exceptions:
 
 
 25
 [1][I]n the "exceptional" case in which review is necessary to prevent a miscarriage of justice or to preserve the integrity of the judicial process,[2] when a new issue arises while appeal is pending because of a change in the law, [3] or when the issue presented is purely one of law and either does not depend on the factual record developed below, or the pertinent record has been fully developed.
 
 
 26
 Bolker, 760 F.2d at 1042 (citations omitted). Here, the first two exceptions are inapplicable, and the third exception counsels strongly against review. Because Cold Mountain did not squarely present the reinitiation claim to the district court, the factual record is undeveloped, showing only that the Forest Service appears to have begun the process of determining whether formal reinitiation was required. Given the incompleteness of the underlying record, we decline to address the hitherto unaired reinitiation claim.
 
 C
 
 27
 Cold Mountain next argues that, because of the project's "controversial" nature and potentially detrimental environmental impacts, the Forest Service violated NEPA by failing to prepare an Environmental Impact Statement ("EIS") before issuing the Permit and FONSI for the bison capture facility. It further contends that new information regarding violations of the hazing restrictions outlined in the Permit and the failure of the Ridge nest require the Forest Service to prepare a supplemental NEPA analysis.
 
 
 28
 The federal defendants respond that mere opposition is insufficient to show that the bison capture project was so controversial as to require an EIS, and that the initial EA and FONSI adequately analyzed the environmental impact of the proposed capture facility. They also argue that supplemental NEPA analysis is not required here because there has been no demonstration of a significant environmental impact warranting agency reexamination. No new information or substantially changed circumstances have been established, the federal defendants continue, and Cold Mountain has particularly failed — both before the issuance of the Permit and after — to introduce scientific evidence compelling supplemental analysis. Finally, they point out that any "major Federal action" was completed upon issuance of the Permit and the FONSI, thereby eliminating the Forest Service's obligation under NEPA to prepare supplemental analyses.
 
 
 29
 * NEPA mandates that federal agencies prepare an EIS for major federal actions "significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). NEPA "does not mandate particular substantive results, but instead imposes only procedural requirements." Laguna Greenbelt, Inc. v. U.S. Dep't of Transp., 42 F.3d 517, 523 (9th Cir.1994); see also Marsh v. Oregon Natural Res. Council, 490 U.S. 360, 371, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989). An agency must therefore take a "hard look" at the environmental consequences of its actions. See Ocean Advocates v. U.S. Army Corps of Eng'rs, 361 F.3d 1108, 1124 (9th Cir. 2004). NEPA also imposes on federal agencies an ongoing duty to issue supplemental environmental analyses. See Price Rd. Neighborhood Ass'n, Inc. v. U.S. Dep't of Transp., 113 F.3d 1505, 1509 (9th Cir. 1997). An agency's decision not to prepare an EIS or other supplemental NEPA analysis may be overturned only if it was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. See Idaho Sporting Cong. Inc. v. Alexander, 222 F.3d 562, 566 n. 2 (9th Cir.2000); Blue Mountains Biodiversity Project v. Blackwood, 161 F.3d 1208, 1211 (9th Cir.1998).
 
 
 30
 Regulations promulgated by the Council on Environmental Quality ("CEQ") outline when an agency must prepare a supplemental analysis — specifically, when the agency "makes substantial changes in the proposed action that are relevant to environmental concerns"; or when "significant new circumstances or information" arise. 40 C.F.R. § 1502.9(c)(1)(i) and (ii). The regulations further define "significantly" in NEPA § 102 as calling for an analysis of both "context" and "intensity." 40 C.F.R. § 1508.27. "Context" is "society as a whole (human, national), the affected region, the affected interests, and the locality." 40 C.F.R. § 1508.27(a). Intensity "refers to the severity of impact," and includes the following factors, among others:
 
 
 31
 (3) Unique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas.
 
 
 32
 (4) The degree to which the effects on the quality of the human environment are likely to be highly controversial.
 
 
 33
 (5) The degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks.
 
 
 34
 ...
 
 
 35
 (7) Whether the action is related to other actions with individually insignificant but cumulatively significant impacts.
 
 
 36
 ...
 
 
 37
 (9) The degree to which the action may adversely affect an endangered or threatened species or its habitat....
 
 
 38
 40 C.F.R. § 1508.27(b).
 
 2
 
 39
 Cold Mountain cites the factors listed above to argue that the environmental impact of the bison capture facility was so significant as to warrant the issuance of an EIS in the first instance. It points particularly to factors (4) and (5), contending that the bison project was both highly controversial — as shown by the opposition and criticism of Cold Mountain and other environmental groups — and highly uncertain — because the individual and cumulative impacts of hazing were not assessed.
 
 
 40
 We have deemed a federal action "controversial if a substantial dispute exists as to [its] size, nature, or effect." Greenpeace Action v. Franklin, 14 F.3d 1324, 1333 (9th Cir.1992) (internal quotation and emphasis omitted, alteration in original). But the existence of opposition does not automatically render a project controversial. Wetlands Action Network v. U.S. Army Corps of Eng'rs, 222 F.3d 1105, 1122 (9th Cir.2000). And a controversy cannot be established post hoc by evidence that was not before the agency at the time of its action. Franklin, 14 F.3d at 1334.
 
 
 41
 Cold Mountain points to the numerous criticisms directed at the proposed facility by it and other groups and individuals prior to the release of the FONSI and the issuance of the Permit. Cold Mountain claims that these comments drew attention to the potential impact of helicopter hazing, but the record actually fails to disclose any reference to helicopter hazing — although the noise associated with the operation of the facility and snowmobile hazing was faulted by opponents of the project.[7] The record reveals, moreover, that the Forest Service and USFWS accordingly evaluated the cumulative effects of human activities — including non-helicopter hazing — over the entire Horse Butte/Flats area. Indeed, the issuance of the Statement was a direct response to the agencies' conclusion that the cumulative effects of the non-helicopter hazing and other human activities associated with the capture facility had "the potential to adversely affect" the Horse Butte nest site. The Forest Service also took pains to ensure that the Permit included extant helicopter hazing restrictions that forbade helicopter hazing of bison into the capture facility and in Zones I and II around the three eagle nest sites.
 
 
 42
 We are satisfied that the Forest Service took the hard look required by NEPA before issuing the Permit and FONSI. The Forest Service exhaustively evaluated the proposed impact of the bison capture facility, soliciting public comments, making available all relevant documents, and formally consulting with the USFWS. See Friends of Endangered Species, Inc. v. Jantzen, 760 F.2d 976, 986 (9th Cir.1985) ("Our task [in reviewing NEPA claims] is simply to ensure that the procedure followed by the [agency] resulted in a reasoned analysis of the evidence before it, and that the [agency] made the evidence available to all concerned."). The Permit incorporated the helicopter hazing restrictions of the bison and eagle management plans — themselves products of a NEPA process. See id. at 987 (noting that the"effect of mitigation measures [is] to be considered in determining whether preparation of an [EIS] is necessary"); see also Wetlands Action Network, 222 F.3d at 1121. The Forest Service's FONSI explicitly referred to the USFWS's BiOp and accompanying take Statement, explaining that the documents provided "reasonable and prudent measures and terms and conditions designed to minimize the level of taking" and concluding that the project was "not expected to significantly affect the continued recovery of the [bald eagle] species regionally or nationally." Any allegations of extensive helicopter hazing were not brought to the attention of the Forest Service until after the issuance of the FONSI and the Permit — exactly the sort of post hoc evidence we frowned upon in Franklin. See Franklin, 14 F.3d at 1334. We therefore conclude that the Forest Service provided the "requisite convincing statement of reasons" explaining why an EIS was unnecessary. See Ocean Advocates, 361 F.3d at 1125; Blue Mountains, 161 F.3d at 1211.
 
 3
 
 43
 In support of its contention that other supplemental NEPA analysis is now warranted by substantial changes or significant new information, see 40 C.F.R. § 1502.9(c)(1)(i) and (ii), Cold Mountain repeats its charges that the Permit's helicopter hazing restrictions have been violated, thereby causing a prohibited take in the form of the reproductive failure of the Ridge nest. We conclude, however, that there is no ongoing "major Federal action" requiring supplementation. See 42 U.S.C. § 4332(2)(C). Because the Permit has been approved and issued, the Forest Service's obligation under NEPA has been fulfilled. See Norton v. S. Utah Wilderness Alliance, 542 U.S. ___, 124 S.Ct. 2373, ___ L.Ed.2d ___ (2004); Marsh, 490 U.S. at 374, 109 S.Ct. 1851.
 
 III
 
 44
 For the foregoing reasons, we AFFIRM the judgment of the district court.
 
 
 
 Notes:
 
 
 [1]
 The herd numbered less than 50 in 1902, but now consists of around 4,000 animalsSee http://www.nps.gov/yell/nature/animals/ bison/bison.html; Greater Yellowstone Coalition v. Babbitt, 952 F.Supp. 1435, 1438 (D.Mont. 1996).
 
 
 [2]
 The Interim Bison Management Plan has since been replaced by the Interagency Bison Management Plan in 2000
 
 
 [3]
 The ESA's citizen-suit provision requires plaintiffs to give 60-days written notice to federal agencies before commencing an actionSee 16 U.S.C. § 1540(g)(2)(A). The requirement is meant to give agencies a chance to investigate and cure alleged ESA violations. See Marbled Murrelet v. Babbitt, 83 F.3d 1068, 1072 (9th Cir.1996).
 
 
 [4]
 On Cold Mountain's motion, the MDOL was voluntarily dismissed from this appeal on August 20, 2003
 
 
 [5]
 Cold Mountain does not appeal these rulings
 
 
 [6]
 We note also the analytically sound underpinnings of the district court's decision. The court noted that the Forest Service had investigated Cold Mountain's allegations of hazing violations and deemed them unfounded. Citing the Forest Service's list of possible reasons for the failure of the Ridge nest, the court further explained that the Horse Butte and Ridge nests had a mixed reproductive history, and that many factors unrelated to bison hazing could have contributed to the reproductive failure of the Ridge nest. Given the absence of evidence in the record suggesting that the hazing restrictions were indeed violated, we agree with the district court that the Forest Service's determination was reasonable. Such determinations involving the factual expertise of agencies can be set aside only if contrary to the highly deferential standard of review embodied in the Administrative Procedures Act ("APA"): "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A);see also Ariz. Cattle Growers' Ass'n v. U.S. Fish and Wildlife, 273 F.3d 1229, 1235-36 (9th Cir.2001) (claims under ESA governed by APA). Here, nothing in the record calls into question the Forest Service's application of its factual expertise.
 
 
 [7]
 We note as well that the Forest Service was not presented with scientific evidence specifically evaluating the environmental effects of the proposed project or calling into question the adequacy of the Service's EACf. Blue Mountains, 161 F.3d at 1213; Sierra Club v. U.S. Forest Serv., 843 F.2d 1190, 1192-93 (9th Cir.1988)