**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**July 10, 2009**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

GREATER YELLOWSTONE
COALITION; JACKSON HOLE
CONSERVATION ALLIANCE;
WYOMING OUTDOOR COUNCIL,

   Petitioners - Appellants,

  v.

TOM TIDWELL,* in his official
capacity as Chief, United States Forest
Service; CAROL "KNIFFY"
HAMILTON, in her official capacity
as United States Forest Service
Supervisor, Bridger-Teton National
Forest; JAMES M. HUGHES, in his
official capacity as Director, United
States Bureau of Land Management;
BOB BENNETT, in his official
capacity as Wyoming State Director,
United States Bureau of Land
Management,

   Respondents - Appellees,

and

STATE OF WYOMING; WYOMING
STOCK GROWERS ASSOCIATION,

   Intervenors-Respondents -
Appellees.

No. 07-8083

---

*Pursuant to Fed. R. App. P. 43(c)(2), Tom Tidwell is substituted for Gail
Kimbell as Chief, United States Forest Service, effective June 17, 2009.

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WYOMING
(D.C. NO. 06-CV-37-ABJ)**

Timothy J. Preso (Abigail M. Dillen with him on the briefs), Earthjustice, Bozeman, Montana, for Petitioners-Appellants.

Robert H. Oakley, United States Department of Justice, Environmental & Natural Resources Division, Washington, D.C.(Ronald J. Tenpas, Assistant Attorney General; James C. Kilbourne and Lori Caramanian, United States Department of Justice, Environmental & Natural Resources Division, Washington, D.C., with him on the brief) for Respondents-Appellees.

C. Levi Martin, Senior Assistant Attorney General, Cheyenne, Wyoming (Jay A. Jerde, Deputy Attorney General, Cheyenne, Wyoming, and John C. McKinley of Davis & Cannon, Cheyenne, Wyoming, with him on the briefs, for Intervenors-Respondents-Appellees.

Before **BRISCOE**, **HOLLOWAY**, and **MURPHY**, Circuit Judges.

**MURPHY**, Circuit Judge.

## I. INTRODUCTION

Petitioners-Appellants Greater Yellowstone Coalition, Jackson Hole Conservation Alliance, and Wyoming Outdoor Council (collectively "GYC") sent a letter to the United States Forest Service ("Forest Service") and the United States Bureau of Land Management ("BLM") requesting the agencies to undertake environmental analyses of Wyoming elk feedgrounds located on federal land. In the letter, GYC alleged the environmental analyses were required pursuant to the

National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4370. Unsatisfied with the agencies' response to its letter, GYC filed a Petition for Review of Agency Action in the United States District Court for the District of Wyoming. GYC alleged the Forest Service and BLM violated NEPA and various federal permitting regulations in connection with the feedgrounds' authorizations. In addition to seeking review of the agencies' actions, GYC requested injunctive relief requiring, *inter alia*, the Forest Service and BLM to undertake environmental analyses of the feedgrounds. The district court denied the requested relief and entered judgment in favor of Respondents. GYC then appealed to this court. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we **vacate** the portions of the district court order that have become moot and **affirm** the other portions.

## II. BACKGROUND

Each winter the State of Wyoming feeds approximately 13,000 elk at twenty-two designated feedgrounds. All or part of twelve of the Wyoming feedgrounds are located on federal lands administered by either the Forest Service or BLM. The Forest Service authorizes use of the land in the Bridger-Teton National Forest for eight feedgrounds: Alkali, Fish Creek, Dog Creek, Dell Creek, Fall Creek, Forest Park, Upper Green River, and Muddy Creek. The Forest Service also authorizes a test-and-slaughter program at the Muddy Creek feedground. This program was created to reduce brucellosis levels among elk that

use feedgrounds. BLM's Pinedale Resource Area hosts four feedgrounds: Scab Creek, Franz, Bench Corral, and Finnegan.

GYC contends that in recent years substantial scientific information has emerged demonstrating the unnatural concentration of elk on feedgrounds significantly increases the incidence of disease outbreak among feedground elk populations. Specifically, GYC points to research indicating brucellosis prevalence among elk averages twenty-four percent at the twelve feedgrounds where the Wyoming Game and Fish Department ("Wyoming") vaccinates for the disease and thirty-two percent at a single feedground where no vaccination is conducted. By contrast, brucellosis prevalence among Wyoming elk not frequenting feedgrounds is only two percent. GYC also claims the unnatural elk concentrations on Wyoming's feedgrounds present a grave risk of a chronic wasting disease epidemic among the feedground elk populations. Chronic wasting disease affects the central nervous system and ultimately results in the death of infected animals.

The Forest Service authorizes use of the Bridger-Teton National Forest feedgrounds by the State of Wyoming through a special use permitting system pursuant to 36 C.F.R. § 251. The State of Wyoming operates the feedgrounds. At the time GYC brought this action, only four of the Bridger-Teton National Forest feedgrounds, Alkali, Dell Creek, Upper Green River, and Forest Park, had special use permits. The permits for the other four Bridger-Teton feedgrounds, Fish

Creek, Dog Creek, Muddy Creek, and Fall Creek, had expired. In addition, three of the feedgrounds, Dell Creek, Upper Green River, and Muddy Creek, had never been subject to an environmental analysis.[1] The most recent environmental analysis of any of the five other feedgrounds occurred in 1981. Of these five environmental analyses, only two discussed wildlife disease. Neither contained any discussion of chronic wasting disease.

Like the Forest Service, BLM allows the State of Wyoming to operate feedgrounds on certain federal lands. In 1981, BLM and Wyoming entered into a Memorandum of Understanding ("MOU") regarding Wyoming's use of BLM lands for elk feedgrounds. No land use permits were issued for the use of this federal land. The only environmental analysis of the feedgrounds was prepared in connection with the 1981 MOU. The environmental analysis did not consider any disease-related impacts of the feedgrounds.

On November, 17, 2005, GYC sent a letter to the Forest Service and BLM alleging various NEPA and federal regulatory violations based upon the lack of permits and environmental analyses for the feedgrounds. When the agencies did not take the actions requested by GYC to remedy these violations, GYC filed a Petition for Review of Agency Action in the United States District Court for the District of Wyoming against various Forest Service and BLM officials. The State

---

[1]We use the broad term "environmental analysis" to refer to both Environmental Assessments and Environmental Impact Statements because the differences are not significant for purposes of this decision.

of Wyoming and the Wyoming Stock Grower's Association were granted intervention as of right as respondents by the district court.

Before the district court, GYC alleged: (1) the Forest Service was required under NEPA to conduct environmental analyses of its eight feedgrounds and the test-and-slaughter program, and failed to do so; (2) the Forest Service's authorization of certain facilities for elk-feeding operations and the test-and-slaughter program without issuing permits violated the agency's special use permitting regulations; and (3) BLM's authorization of facilities for elk-feeding violated BLM's own permitting regulations and the lack of current environmental analyses of the feedgrounds violated NEPA. GYC asked the court to award injunctive relief requiring Respondents to undertake environmental analyses of the feedgrounds and enjoining authorization of the test-and-slaughter program until an environmental analysis of the program occurred.

On August 24, 2007, the district court issued a Memorandum Opinion and Order rejecting GYC's claims. First, with respect to the Forest Service feedgrounds for which permits existed, the district court refused to compel supplemental environmental analyses because it concluded the major federal action was completed when the permits were issued. Second, with respect to the Forest Service feedgrounds without permits, the district court concluded GYC lacked standing to raise a NEPA challenge and there was no final agency action sufficient to raise a claim under the Administrative Procedure Act. Third, with

respect to the test-and-slaughter program at the Muddy Creek feedground, the district court concluded GYC lacked standing on the permitting claim and the NEPA claim failed because the Forest Service's authorization of the facilities was not a major federal action. Finally, with respect to the BLM feedgrounds, the district court rejected GYC's permitting and NEPA claims, concluding BLM adequately authorized the feedgrounds pursuant to the 1981 MOU.

On appeal, GYC seeks review of the agencies' decisions not to conduct the requested new or supplemental environmental analyses of the feedgrounds. GYC also seeks to enjoin use of the test-and-slaughter facilities until an environmental analysis is undertaken and requiring the Forest Service and BLM to undertake environmental analyses of the twelve Wyoming feedgrounds. After the briefs were filed in this appeal, the Forest Service granted long-term permits authorizing Wyoming to use the four previously non-permitted feedgrounds, including the test-and-slaughter program at Muddy Creek, for winter elk management activity.[2] In connection with the long-term authorizations, the Forest Service undertook an environmental analysis of the Alkali Creek, Fish Creek, Fall Creek, Muddy Creek (including the test-and-slaughter program), Dog Creek, and Upper Green River feedgrounds. The environmental analysis considered the risks and impacts of brucellosis and chronic wasting disease.

---

[2] Long-term authorization was also granted at that time for the Upper Green River feedground.

**III.  DISCUSSION**

GYC brings its claims pursuant to 5 U.S.C. § 706, the judicial review provision of the Administrative Procedure Act, which allows courts to review agency action and compel agency action unlawfully withheld.  The district court exercised jurisdiction over the claims pursuant to 28 U.S.C. § 1331.  This court reviews the district court's decision de novo.  *N.M. Cattle Growers Ass'n v. U.S. Fish & Wildlife Serv.*, 248 F.3d 1277, 1281 (10th Cir. 2001).  "We will not set aside an agency decision unless it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  *Utah Envtl. Congress v. Russell*, 518 F.3d 817, 823 (10th Cir. 2008) (quotation omitted); 5 U.S.C. § 706(2)(A).

*A.     Mootness*

Respondents argue GYC's claims as to the Alkali Creek, Fish Creek, Fall Creek, Muddy Creek, Dog Creek, and Upper Green River feedgrounds became moot in July 2008 when the environmental analysis of these feedgrounds was issued.  GYC argues the claims fall within the voluntary cessation exception to the mootness doctrine.

"Under Article III of the Constitution, federal courts may adjudicate only actual, ongoing cases or controversies."  *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477 (1990).  "To qualify as a case fit for federal-court adjudication, an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed."  *Arizonans for Official English v. Arizona*, 520 U.S. 43, 67

(1997) (quotation omitted). "If a party to an appeal suggests that the controversy has, since the rendering of judgment below, become moot, that party bears the burden of coming forward with the subsequent events that have produced that alleged result." *Cardinal Chem. Co. v. Morton Int'l, Inc.*, 508 U.S. 83, 98 (1993). "Vacatur is in order when mootness occurs through . . . the unilateral action of the party who prevailed in the lower court." *Arizonans for Official English*, 520 U.S. at 71-72 (quotation omitted).

An exception to the mootness doctrine can occur when a defendant voluntarily ceases a challenged action. *ARW Exploration Corp. v. Aguirre*, 947 F.2d 450, 453 (10th Cir. 1991). This exception "traces to the principle that a party should not be able to evade judicial review, or to defeat a judgment, by temporarily altering questionable behavior." *City News & Novelty, Inc. v. City of Waukesha*, 531 U.S. 278, 284 n.1 (2001). Thus, the voluntary cessation of a challenged practice does not render a case moot unless there is no reasonable expectation the wrong will be repeated. *Longstreth v. Maynard*, 961 F.2d 895, 900 (10th Cir. 1992).

GYC brought this action alleging the lack of environmental analyses for the six feedgrounds in question violated NEPA. GYC sought to compel the Forest Service to undertake environmental analyses of the feedgrounds, including the test-and-slaughter program at Muddy Creek, to address current disease risks. The

Forest Service did exactly this in its July 2008 environmental analysis. Thus, no live controversy exists with regard to these feedgrounds.

As to GYC's contention that the Forest Service's actions fall within the voluntary cessation exception to the mootness doctrine, there is no reasonable expectation the alleged wrongs involving the six feedgrounds in question will be repeated. The Forest Service has issued an environmental analysis addressing the threat of disease at these feedgrounds. It is thus impossible for the Forest Service to return to its allegedly illegal conduct of failing to conduct an environmental analysis addressing the brucellosis and chronic wasting disease risks at these feedgrounds. Because these issues became moot as a result of the unilateral activity of the Forest Service, however, vacatur is appropriate. *See Arizonans for Official English*, 520 U.S. at 71-72. We therefore vacate the portions of the district court ruling addressing the six feedgrounds assessed in the July 2008 environmental analysis.

B.   *The Forest Park and Dell Creek Forest Service Feedgrounds*

GYC has live claims as to the Forest Park and Dell Creek Forest Service feedgrounds. NEPA requires an environmental analysis of a project "when the federal government's involvement in [the] project is sufficient to constitute 'major federal action.'" *Vill. of Los Ranchos de Albuquerque v. Barnhart*, 906 F.2d 1477, 1480 (10th Cir. 1990) (quoting 42 U.S.C. § 4332(C)). "Major Federal

action includes actions with effects that may be major and which are potentially subject to Federal control and responsibility." 40 C.F.R. § 1508.18.

1.  Forest Park

The last environmental analysis of the Forest Park feedground occurred in 1980.  Under 40 C.F.R. § 1502.9(c), agencies "[s]hall prepare supplements to either draft or final environmental impact statements if: (i) The agency makes substantial changes in the proposed action that are relevant to environmental concerns; or (ii) There are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." The Supreme Court has addressed the issue of when an agency must undertake a supplemental environmental analysis in the context of relevant new information or circumstances.  "If there *remains major Federal action to occur*, and if the new information is sufficient to show that the remaining action will affect the quality of the human environment in a significant manner or to a significant extent not already considered, a supplemental [environmental analysis] must be prepared." *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 374 (1989) (emphasis added) (quotations omitted).

GYC contends circumstances have changed since the 1980 Forest Park environmental analysis as a result of the discovery of the brucellosis and chronic wasting disease threats at feedgrounds, and thus the Forest Service must undertake a supplemental analysis to address these changes.  The Forest Service

-11-

points out that the duty to supplement an environmental analysis under NEPA ends after the major federal action is completed, and alleges the major federal action here was completed when the permit was issued. According to GYC, however, the elk feeding activities constitute an "ongoing" major federal action under NEPA because the Forest Park permit states it "may be amended in whole or in part by the Forest Service when, at the discretion of the authorized officer, such action is deemed necessary or desirable to incorporate new terms, conditions, and stipulations as may be required by law, regulation, land management plans, or other management decisions."

In *Norton v. Southern Utah Wilderness Alliance*, the Supreme Court considered whether there was major federal action to occur or ongoing major federal action when allegedly new circumstances arose after BLM approved a land use plan for federal lands it administered in Utah. 542 U.S. 55, 72-73 (2004). "Generally, a land use plan describes, for a particular area, allowable uses, goals for future condition of the land, and specific next steps." *Id.* at 59. After noting that "the Secretary may issue management decisions to implement land use plans," the Court concluded there was no ongoing major federal action or major federal action to occur. *Id.* at 69, 73 (quotation omitted). The Court distinguished an earlier case where it concluded a major federal action was not yet complete, explaining that in the earlier case:

that condition was met: The dam construction project that gave rise to environmental review was not yet completed. Here, by contrast, although the "*approval* of a [land use plan]" is a "major Federal action" requiring an EIS . . . that action is completed when the plan is approved. The land use plan is the "proposed action" contemplated by [NEPA]. There is no ongoing "major Federal action" that could require supplementation . . . .

*Id.* at 73 (discussing *Marsh*, 490 U.S. at 374).

Here, the Forest Service's approval and issuance of the Forest Park permit, like BLM's approval of the land use plan in *Norton*, was the major federal action contemplated by NEPA. Under *Norton*, that major federal action was completed when the permit was approved and issued. *See also Cold Mountain v. Garber*, 375 F.3d 884, 894 (9th Cir. 2004) (concluding no supplemental analysis was required for a Bison-testing facility operated by the State of Montana on federal land pursuant to a Forest Service permit because the Forest Service's NEPA obligations ended when the permit was issued and approved). It is important to note the relevant NEPA provisions expressly apply only to *federal* action. 42 U.S.C. § 4332(C). Since issuance of the permit, the Forest Service has remained largely uninvolved in the operations of the feedground. That the Forest Service retains discretion to amend the permit does not alone lead to the conclusion there is ongoing major federal action or major federal action to occur. While the Forest Service could potentially amend the permit in such a manner as to constitute a major federal action, there is no allegation this has occurred. Because the State of Wyoming remains the only meaningful actor involved in the operation of the

Forest Park feedground, there is no ongoing major federal action or major federal action to occur. Thus, the Forest Service's decision not to undertake an environmental analysis of the Forest Park feedground was not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. We therefore affirm the district court's denial of GYC's request to compel an environmental analysis of the Forest Park feedground.

2. Dell Creek

The Forest Service has never conducted an environmental analysis of the Dell Creek feedground. NEPA's implementing regulations state major federal actions may include "new and continuing activities, including projects and programs entirely or partly financed, assisted, conducted, regulated, or approved by federal agencies." 40 C.F.R. § 1508.18(a). Because GYC's challenge to the Forest Service's initial failure to conduct an environmental analysis of the Dell Creek feedground would presumably be barred by the relevant statute of limitations,[3] GYC argues the Forest Service's involvement with the Dell Creek feedground is a continuing federal activity that satisfies the definition provided in 40 C.F.R. § 1508.18(a) of a major federal action. This is so, according to GYC,

___

[3] There is a six-year statute of limitations pursuant to 28 U.S.C. § 2401(a). *See Chem. Weapons Working Group, Inc. v. U.S. Dept. of the Army*, 111 F.3d 1485, 1494-95 (10th Cir. 1997) (applying the six-year statute of limitations under 28 U.S.C. § 2401(a) to an action brought under the APA when plaintiffs did not deny that the six-year statute of limitations applied). The most recent Dell Creek permit was issued in 1996 and this lawsuit was not filed until 2006.

because like the Forest Park permit, the Dell Creek permit provides the Forest Service may amend the permit "when, at the discretion of the authorized officer, such action is deemed necessary or desirable to incorporate new terms, conditions, and stipulations."

In support of this argument, GYC relies primarily on two cases. In *Hart v. Denver Urban Renewal Authority*, the United States Department of Housing and Urban Development ("HUD") entered into a loan and capital grant contract prior to NEPA's enactment. 551 F.2d 1178, 1179 (10th Cir. 1977). This contract required HUD to approve all acquisitions and dispositions of property. *Id.* at 1181. This court concluded HUD's handling of a certain structure within the project, which included treating "this building separately in its negotiations and administratively as evidenced by the fact it was not demolished and has been contracted to be sold as a separate structure," was continuing federal action constituting a major federal action. *Id.* at 1181-82.

GYC relies heavily on this court's statement in *Hart* that, "as long as agency decisions remain to be made or are open to revision, [NEPA] should be applied." *Id.* at 1181. This statement, however, merely summarizes the holdings of two cases from other circuits in which the courts also were faced with whether or not to apply NEPA to major agency actions ongoing at the time NEPA became effective. *Id.* The courts in those cases concluded that for projects ongoing at the time of NEPA's passage, Congress intended NEPA to apply unless the project had

-15-

reached a stage of completion such that NEPA's application could be considered a retroactive application not intended by Congress. *Swain v. Brinegar*, 517 F.2d 766, 773-74 (7th Cir. 1975); *Arlington Coal. on Transp. v. Volpe*, 458 F.2d 1323, 1331 (4th Cir. 1972). Contrary to GYC's assertion, instead of merely considering whether there were agency decisions yet to be made or open to revision, this court in *Hart* went on to identify the key inquiry in the analysis: whether the actual, not potential, involvement of the federal government to date in the activity constituted a major federal action. *See Hart*, 551 F.2d at 1181-82.

In the second case relied upon by GYC, *Morris County Trust for Historic Preservation v. Pierce*, HUD approved an urban renewal plan and entered into a loan and capital grant contract, again prior to the passage of NEPA. 714 F.2d 271, 273 (3d Cir. 1983). The contract required the "local public agency . . . to furnish HUD promptly with documentary data concerning any proposed actions of the local agency pertaining to the project" and authorized "HUD to inform the local agency in writing of its objection to a proposed step, and to refuse a requested payment if the agency proceeds without securing the prior approval of the Secretary of HUD." *Id.* at 278. It was alleged that HUD failed to comply with NEPA because it never undertook an environmental analysis of the project. *Id.* at 275. HUD argued its inaction did not violate NEPA because the effective date of NEPA succeeded the signing of the contract and the approval of the urban renewal plan. *Id.* After noting the district court's finding that "HUD has

-16-

*remained meaningfully involved* in the Project[,]" the court concluded "NEPA should be applicable to federally-assisted projects [like the one in question] which were initiated prior to 1970 but which remain subject to the authority of a Federal agency to review the implementation of the project on a stage by stage basis." *Id.* (emphasis added). Thus, like this court in *Hart*, in reaching its conclusion the court analyzed the actual degree of ongoing federal involvement in the project. *Id.*

The cases cited by GYC stand only for the proposition that if an agency began a project prior to the passage of NEPA, that alone would not shield the agency from NEPA compliance if the agency *remained meaningfully involved* in the project after NEPA became effective. They are not, however, authority for the existence of a major federal action merely because an agency retains a degree of discretion in a project. The district court was thus correct when it opined that "it would be a stretch to use these cases to stand for the proposition [GYC] desires." The projects in the cases cited by GYC involved continuing meaningful federal agency involvement at various stages. Here, however, the State of Wyoming manages the feedground and there is nothing in the permit mandating continuing, stage-by-stage involvement of the Forest Service.

More relevant to this analysis is *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55. While *Norton* involved the question of whether there was "ongoing major Federal action" or "major Federal action to occur" in a federally

-17-

approved activity so as to require a supplementary environmental analysis, *id.* at 73, the Court's analysis is certainly relevant to the issue of whether there is a "continuing Federal action" requiring an initial environmental analysis. In *Norton*, although the Secretary retained discretion to issue management decisions to implement the land use plan in question, the Court held that the federal action was completed when the plan was approved. *Id.* at 69, 73. This holding indicates that, as with the Forest Park permit, the major federal action was completed when the Forest Service issued the Dell Creek permit in 1996, and was not continuing.[4] *See id.*; *Cold Mountain v. Garber*, 375 F.3d at 894. Thus, the Forest Service's decision not to undertake an environmental analysis of the Dell Creek feedground was not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. We therefore affirm the district court's denial of GYC's request to compel an environmental analysis of the Dell Creek feedground.

---

[4]GYC's citation to a 2005 email indicating the Forest Service approved a request from Wyoming to build a small holding pen on the Dell Creek feedground does not change this analysis. This was a minor change initiated by Wyoming and merely approved by the Forest Service. There is no evidence the permit was formally amended. Nor was it a situation where the Forest Service attempted to influence the project in any material manner pursuant to the discretion given by the permit. Finally, there is no assertion that the approval of the holding pen itself was a major federal action. *See Citizens Organized to Defend the Env't, Inc. v. Volpe*, 353 F. Supp. 520, 541 (S.D. Ohio 1972) (concluding no continuing federal activity existed for NEPA purposes for tasks undertaken by the federal agency in relation to the project that do not require substantial planning, time, or resources).

C.    *The BLM feedgrounds*

In 1981, BLM and Wyoming entered into an MOU.  The MOU stated its purpose was "to recognize and coordinate management of those winter elk feeding programs which impact Federal surface and/or mineral estates in Sublette County, Wyoming."  The agreement set forth the objectives and operating procedures of both agencies.  BLM agreed to "[a]uthorize, through legal authority and this Memorandum, the continued use of existing facilities falling on public lands [by Wyoming]."  It also agreed to "[a]llow [Wyoming] to maintain, reconstruct, or construct access roads, trails, facilities, etc., as mutually deemed necessary by [BLM] and [Wyoming]." An environmental analysis of the feedgrounds was prepared in connection with the MOU.

GYC claims NEPA demands an environmental analysis of disease threats related to the four BLM elk feedgrounds.  GYC argues BLM's failure to issue permits for the use of the affected federal lands in contravention of 43 C.F.R. § 2920.1-1 constitutes major federal action triggering NEPA requirements pursuant to the "failure to act" language of 40 C.F.R. § 1508.18. Respondents contend the district court correctly determined the MOU was rightfully undertaken in lieu of the permitting procedures required by 43 C.F.R. § 2920.1-1, and thus the failure to issue permits is not a major federal action requiring an environmental analysis.  Resolution of the issue depends primarily on the relationship between a provision of the Federal Land Management Policy Act of

1976 ("FLPMA"), 43 U.S.C. § 1737(b), and BLM's permitting regulations for non-federal uses of the public lands at 43 C.F.R. §§ 2920.1-1, 1-2.

43 U.S.C. § 1737 provides in relevant part:

(b) Contracts and cooperative agreements

Subject to the provisions of applicable law, the Secretary may enter into contracts and cooperative agreements involving the management, protection, development, and sale of public lands.

43 C.F.R. §§ 2920.1-1, 1-2 provide in relevant part:

§ 2920.1-1 Authorized Use
Any use not specifically authorized under other laws or regulations and not specifically forbidden by law may be authorized under this Part. Uses which may be authorized include residential, agricultural, industrial, and commercial, and uses that cannot be authorized under title V of [FLPMA] . . . Land use authorizations shall be granted under the following categories:

. . . .

(b) Permits shall be used to authorize uses of public lands for not to exceed 3 years that involve either little or no land improvement, construction, or investment . . . .

§ 2920.1-2 Unauthorized Use

(a) Any use, occupancy, or development of the public lands, other than casual use as defined in § 2920.0-5(k) of this title, without authorization under the procedures in § 2920.1-1 of this title, shall be considered a trespass.

According to GYC, because agreements authorized under 43 U.S.C. § 1737(b) are "Subject to the provisions of applicable law," they remain subject to the requirements of 43 C.F.R. §§ 2920.1-1, 1-2. Thus, GYC argues that in

authorizing ongoing feedground operations, BLM was required to issue permits of no more than three years' duration informed by the appropriate NEPA analysis.

The permitting regulations cited by GYC, 43 C.F.R. §§ 2920.1-1, 1-2, were expressly promulgated pursuant to 43 U.S.C. § 1732 with no reference to 43 U.S.C. § 1737(b). Leases, Permits, and Easements; Land Use Authorizations Under the Federal Land Policy and Management Act, 46 Fed. Reg. 5772, 5777 (Jan. 19, 1981) ("Under the authority of [43 U.S.C. § 1732], . . . the Code of Federal Regulations [is] amended as set forth below."); Leases, Permits, and Easements; Effective Dates of Permit Decisions; Appeal Procedure, 61 Fed. Reg. 32351 (June 24, 1986) ("The existing regulations in 43 CFR part 2920 contain procedures for many types of land users to obtain authorizations in the form of permits, leases, and easements to use, occupy, and develop public lands and their resources. BLM's statutory authority to allow these uses is found in . . . 43 U.S.C. § 1732."). The first clause of 43 U.S.C. § 1732(b) is considerably broader than 43 U.S.C. § 1737(b). Specifically, 43 U.S.C. § 1732(b) directs BLM to regulate "the use, occupancy, and development of the public lands." 43 U.S.C. § 1732(b). In contrast, 43 U.S.C. § 1737(b) permits BLM to "enter into contracts and cooperative agreements involving the management, protection, development, and sale of public lands." 43 U.S.C. § 1737(b). Thus, the first clause of 43 U.S.C. § 1732(b) refers to *all* land uses and development, while 43 U.S.C. § 1737(b) governs a subset of activities carried out under contracts or cooperative

-21-

agreements.  If 43 U.S.C. § 1737(b) did not exist, the activities covered by that statute would still be covered by 43 U.S.C. § 1732(b), and such uses would be subject to the regulations at 43 C.F.R. §§ 2920.1-1, 1-2.

43 U.S.C. § 1737(b) does exist, however, and its interplay with 43 U.S.C. § 1732(b) is addressed, in part, in the latter provision:

> In managing the public lands, [BLM] shall, subject to this Act and other applicable law and under such terms and conditions as are consistent with such law, regulate, through easements, permits, leases, licenses, published rules, or other instruments as [BLM] deems appropriate, the use, occupancy, and development of the public lands . . . *Provided*, That unless otherwise provided for by law, [BLM] may permit . . . where the proposed use and development are similar or closely related to the programs of [BLM] for the public lands involved, cooperative agreements under section 1737(b) of this title.

43 U.S.C. § 1732(b).  The language following the word "*Provided*" suggests that Congress intended 43 U.S.C. § 1737(b) cooperative agreements to be approved by BLM outside of the process required for all other uses under 43 U.S.C. § 1732(b).

Moreover, an alternative reading would render 43 U.S.C. § 1737(b) superfluous.  If the management and stewardship activities described in 43 U.S.C. § 1737(b) required approval under the same permitting procedure used for all other activities, there would be no reason for BLM to enter into 43 U.S.C. § 1737(b) cooperative agreements because it would still have to issue permits under 43 C.F.R. §§ 2920.1-1, 1-2.  "[A] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous,

-22-

void or insignificant." *Corley v. United States*, 129 S.Ct. 1558, 1566 (2009) (quotations omitted).

In light of the statute's structure, the most likely purpose of the phrase "Subject to the provisions of applicable law" at the beginning of 43 U.S.C. § 1737(b) is not to require BLM to go through the permitting process at 43 C.F.R. §§ 2920.1-1, 1-2 for uses allowed under cooperative agreements, but is instead to ensure the uses approved through cooperative agreements are in compliance with other statutes imposing limitations on the uses of federal land and the activities of federal agencies such as NEPA, the Endangered Species Act, and FLPMA's multiple use and sustained yield mandate. GYC's argument is also undercut by the language of 43 C.F.R. § 2920.1-1, which states, "[a]ny use not specifically authorized under other laws or regulations and not specifically forbidden by law may be authorized under this Part." Because the agreement here was authorized under other law, namely 43 U.S.C. § 1737(b), 43 C.F.R. § 2920.1-1 is not applicable. *See also Peter v. Smilde*, 144 I.B.L.A. 31, 34 n.3 (1998) ("The department has traditionally regarded the issuance of special use permits as appropriate only if the proposed use could not be authorized under other law.").

Even assuming the phrase "Subject to the provisions of applicable law" creates ambiguity as to whether the permitting regulations must be followed when cooperative agreements are used, the statute's legislative history further supports Respondents' position. *United States v. Manning*, 526 F.3d 611, 614 (10th Cir.

2008) ("If the statute's plain language is ambiguous as to Congressional intent, we look to the legislative history and the underlying public policy of the statute." (quotation omitted). Respondents point to the House Report for 43 U.S.C. § 1737(b), which provides:

> The Committee expects the Secretary of the Interior to use this authority whenever contracting or cooperative agreements would be the more feasible or economical way to accomplish the purposes of this bill. These advantages would be particularly true where States and local government entities have competent organizations in being which could effectively carry out the Secretary's programs. Examples of the types of activities which might be handled in this manner include, among others, fire prevention and suppression, law and regulation enforcement, supervision of the range especially in intermingled land areas, and construction of facilities.

H. Rep. No. 94-1163, at 16 (1976), as *reprinted in* 1976 U.S.C.C.A.N. 6175, 6190. The House Report would not have called cooperative agreements "*more feasible or economical*" except in comparison to the procedure for allowing all other uses on public lands, i.e., 43 U.S.C. § 1732(b) and its permitting regulations. Cooperative agreements would surely not be more feasible or economical if the permitting procedure had to be followed each time BLM entered into such an agreement. The House Report also indicates the construction of feedgrounds pursuant to an agreement between BLM and the State of Wyoming is the type of agreement envisioned by the House Report as a "more feasible or economical way to accomplish the purposes of this bill." The district court appropriately opined that "[t]he inclusion of construction of facilities in the above

-24-

House Report undermines GYC's argument that [43 U.S.C. § 1737(b)] does not provide a parallel track for land use authorizations that would allow the BLM to bypass permitting requirements under 43 C.F.R. § 2920.1-1." (Quotations omitted).

GYC asserts the MOU's authorization of feedgrounds "through *legal authority* and this Memorandum," means the MOU is not self-executing, but instead acknowledges the need for additional legal authority, i.e., a § 2920.1-1 permit. It is more likely, however, that the term "legal authority" refers to 43 U.S.C. § 1737(b), which, as discussed above, provides for the type of agreement entered into here.

Finally, GYC argues that even assuming the MOU properly authorized the feedgrounds, this is an ongoing major federal action requiring a supplemental analysis under NEPA due to changed circumstances. The federal action is ongoing, GYC contends, because the MOU provides BLM will review the MOU for "operating efficiency" annually and BLM may renegotiate the MOU based on the outcome of that review. As with the Forest Service permits discussed above, the major federal action here occurred when BLM entered into the MOU. That BLM reviews the MOU yearly and has the discretion to renegotiate does not by itself establish a continuing federal action. *See Norton*, 542 U.S. at 73; *Cold Mountain,* 375 F.3d at 894.

Thus, we conclude BLM's actions with regard to the four Wyoming feedgrounds in question were not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and affirm the district court's denial of GYC's request to compel BLM to undertake environmental analyses of these feedgrounds.

## IV.  CONCLUSION

GYC's claims as to the six feedgrounds included in the July 2008 environmental analysis are moot.  We therefore **vacate** the portions of the district court opinion addressing those feedgrounds.  We **affirm** the decision of the district court as to GYC's remaining claims.